ADAMS, EXECUTOR, ETC. *v.* DAVIS, et al.

No. 40736          April 21, 1958          102 So. 2d 191

*Green, Green, & Cheney,* Jackson, for appellant, William Wayne.

*Jackson & Ross,* Jackson, for appellants, C. V. Adams, Executor C. T. A. of the Estate of Vera Manese White, Sadie Hampton Grace, Irma Hampton Cook, Ester H. Benjamin, Helen Z. Hampton Thompson, and Ruth Hampton Pollard.

*Carter* & *Van Every* Columbus; *J. A. Phillips,* Macon, for appellees.

HOLMES, J.

This is a will contest involving the alleged last will and testament of Vera Manese White, deceased. Vera Man-

ese White died on March 2, 1955. At the time of her death she owned approximately 285 acres of land in Noxubee County, on which she and her husband, Tom White, had resided for many years. This land comprised substantially Vera's entire estate. She and her husband had no children, and Tom survived his wife as her sole heir at law. He died intestate on April 18, 1955, a little more than one month after the death of his wife. Tom was a competent painter and paper hanger and pursued his trade up until about two years prior to his death when he became bedridden and practically an invalid. Vera looked after the farm. At one time she had as many as twelve or fifteen families of sharecroppers on the farm and about 23 head of cattle. She maintained an active bank account in the Merchants and Farmers Bank of Macon, Mississippi, until shortly before her death. Both Vera and her husband were over 60 years of age at the time they died.

On April 22, 1953, Vera went to the office of Roger C. Landrum, an attorney in Columbus, Mississipp, and employed him to prepare her will. She was accompanied by her niece, Helen Z. Hampton Thompson (sometimes called Helen and sometimes called Blanche), who was on a visit from her home in Detroit, Michigan. Vera told Mr. Landrum what property she had and the disposition she desired to make of it. Mr. Landrum had never met or seen either Vera or Blanche Thompson prior to this occasion. Blanche did not participate in the conference between Mr. Landrum and Vera other than to occasionally assist Vera in remembering the complete names of some of the devisees. After receiving the instructions from Vera as to the disposition which she desired to be made of her property, Mr. Landrum prepared the will. He told Vera that in his practice he usually prepared wills in at least duplicate copies so that in the event the original should be lost the copy could be probated if there were no objections. In this instance he prepared the will

in triplicate, and it was executed in triplicate in Mr. Landrum's office and witnessed by Mr. Landrum and his secretary, Virginia Bragg.

After the will was prepared and each copy thereof had been executed, Vera inquired of Mr. Landrum if he could rent a safety deposit box for her in the bank in which to place her will and other papers. On inquiry, it developed that the bank was unable to rent the box, and Vera then requested Mr. Landrum to place the original or ribbon copy of the executed will and some other papers in his own safety deposit box for safekeeping. This Mr. Landrum consented to do. Blanche then asked if she might have one of the copies of the will in order that she could show her people what Vera had done. Mr. Landrum said that this took place in the presence of Vera, and since there was no objection on the part of Vera, and since Blanche knew the contents of the will, he gave her one of the executed copies. He placed the other executed copy in his own files and placed the original or ribbon copy together with some other papers in his safety deposit box for safekeeping for Vera. Mr. Landrum stated that Vera was clearly mentally capacitated at the time of the execution of the will and fully understood what she was doing and gave specific instructions as to the disposition which she desired made of her property. Mr. Landrum further stated that on May 15, 1953, about one month later, Vera came to his office with some colored woman whom he did not know and asked him for "my will and papers". He said that he obtained the will and papers from his safety deposit box and returned them to Vera and took her receipt therefor and that he has not since seen the will.

In the latter part of December 1954, or the early part of January 1955, Vera suffered an illness or slight stroke at her home and was taken to the hospital in Macon and was later taken to the home of James Pendleton in Columbus, where she remained until she died. She kept

under her bed in Columbus a black handbag in which she had been known to keep her will after it was returned to her by Mr. Landrum. The original or ribbon copy of the will was not found among Vera's effects after her death, and Blanche Thompson presented the copy of the will which she had to the Chancery Court of Noxubee County for probate in common form as the true last will and testament of Vera Manese White, deceased, and it was admitted to probate in common form by decree of the Chancery Court of Noxubee County on February 2, 1957. Blanche Thompson, who had been named as executrix in the will, waived her right to qualify as the executrix in view of her non-residence and petitioned that C. V. Adams, Chancery Clerk of Noxubee County, be appointed administrator CTA of the estate of the deceased, and the decree of the court admitting the will to probate in common form directed the issuance of letters of administration C.T.A. to the said C. V. Adams, Chancery Clerk, and he qualified as such administrator.

The will of the deceased as executed by her devised to her husband for life 160 acres of land described as that included in her application for homestead exemption, and provided that at his death said acreage, along with other land which she owned, should be devised as follows: To Sadie Hampton Grace, 10 acres; to Irma Hampton Cook, 10 acres, to Ruth Hampton Pollard, 10 acres; to William Wayne, 60 acres; and the balance to Helen Z. Hampton Thompson and Esther Hampton Benjamin, as tenants in common, with the provision that the said Helen Z. Hampton Thompson be empowered to determine the particular parcels to be received by the said named parties, and with the further provision that as to that part of the real estate owned by her at the time of her death and not constituting part of her homestead the same should descend immediately upon her death to the parties designated by Helen Z. Hampton Thompson.

Within the period of two years allowed by statute for

a contest of the will, the heirs at law of Tom White, deceased, filed their petition in the Chancery Court of Noxubee County seeking to have set aside the decree admitting the aforesaid instrument to probate as the last will and testament of Vera Manese White, deceased, and to have the appointment of C. V. Adams, Chancery Clerk, as administrator C.T.A. revoked, and to have the aforesaid instrument of writing adjudicated not to be the last will and testament of the deceased, and to have it adjudicated that the deceased died intestate. The proponents of the will were certain nieces of Vera, being the children of Vera's sister, Jane, and one William Wayne. The latter was distantly related to Vera and had been reared by Vera. His home was in Jackson.

The contestants, who are the appellees here, assailed the will upon the grounds (1) that it was procured through undue influence exercised upon the testatrix by Helen Z. Hampton Thompson, and (2) that at the time of the execution of the will the testatrix was without the mental capacity to make a will, and (3) that the instrument admitted to probate was a copy and not the true last will and testament of the testatrix and that the original thereof had been destroyed by the testatrix animo revocandi.

■■ Upon the conclusion of the evidence, the chancellor found as a fact that the proof failed to show undue influence or the lack of mental capacity on the part of the testatrix at the time of the execution of the will, and he was amply warranted in so doing. The record is wholly barren of any substantial proof to establish undue influence or mental incapacity. The chancellor further held, however, that since the proof showed that the original will was last seen in the possession of the testatrix in July 1954, and was not found after her death, it must be presumed to have been destroyed animo revocandi, and that, therefore, the testatrix must be held to have died intestate, and he rendered a decree accordingly.

In this we think the learned chancellor was in error. There is no dispute about the fact that the will was executed in triplicate, and that the executed original thereof was placed by Mr. Landrum, the attorney who drew the will, in his safety deposit box for safekeeping for the testatrix, and that one executed copy thereof was retained by Mr. Landrum in his files, and that the other executed copy thereof was given to Helen Z. Hampton Thompson in the presence of and with the acquiescence of the testatrix. It is further undisputed that about one month later, the testatrix returned to Mr. Landrum and requested that he return to her "my will and papers" and that the original of the will was then returned to the testatrix. It is further undisputed that the will was last seen in the possession of the testatrix in July 1954 and that it was not found after her death. The question presented, therefore, is whether under these facts, considered in relation to the other evidence in the case, it is to be presumed that the testatrix destroyed her will animo revocandi. In determining this question favorably to the contestants, the chancellor based his decision entirely upon the ground that the testatrix must be presumed to have destroyed her will in view of the proof that the will was last seen in possession of the testatrix in July, 1954, and was not found after her death.

There is no difficulty about the law of the case. Section 658, Mississippi Code of 1942, prescribes the manner in which a will once made may be revoked. It provides:

"A devise so made, or any clause thereof, shall not be revocable but by the testator or testatrix destroying, canceling, or obliterating the same, or causing it to be done in his or her presence, or by subsequent will, codicil, or declaration, in writing, made and executed; . . ."

■■■ There is no direct proof that Vera White after executing her will revoked the same by "destroying, canceling, or obliterating the same, or causing it to be done in his or her presence, or by subsequent will, codicil, or

declaration, in writing, made and executed." We are fully cognizant of the rule, however, with respect to the rebuttable presumption of revocation which arises where a will which cannot be found following the death of a testator is shown to have been in his possession when last seen. "Where a will which cannot be found following the death of the testator is shown to have been in his possession when last seen, the presumption is, in the absence of other evidence, that he destroyed it animo revocandi. The rule is not altered by the fact that the will was executed in duplicate and one of the copies was in possession of another person." 57 Am. Jur., Wills, Sec. 551.

In an annotation appearing in 17 A. L. R. 2d, page 814, the following is said: "The general rule that where a will which cannot be found following the death of the testator is shown to have been in his possession when last seen, the presumption that he destroyed it animo revocandi, is usually held applicable in instances where two or more duplicate original wills were executed, with the result that where one of the duplicates is traced to the possession of the testator prior to his death, there is, if such duplicate cannot be found after testator's death, a rebuttable presumption that he destroyed it with the intention of revoking both it and any other duplicates."

In Section 437, Page on Wills, Vol. 1, quoted with approval in Phinizee v. Alexander, 210 Miss. 196, 49 So. 2d 250, the following appears: "This so-called presumption, however, is an inference of fact and not a conclusion of law. The inference is weaker where testator has both copies of the will, and stronger where one of the copies is in the possession of a third person."

The presumption of intention to revoke may be rebutted. 68 C. J., Sec. 758, p. 992; Phinizee v. Alexander, supra. In McCormick v. Warren, 89 So. 2d 702, we held that the intent to revoke must appear clearly and un-

equivocably. A clear and concise statement of the applicable rule appears in 1 Jarman, A Treatise on Wills, Sixth Edition, Chapter VII, page 152, as follows:

"If a will is traced into the testator's possession, and is not found at his death, the presumption is that he destroyed it for the purpose of revoking it; but the presumption may be rebutted, and it will be more or less strong according to the character of the custody which the testator had over the will. It is difficult to lay down any general rule as to the nature of the evidence which is required to rebut the presumption of destruction. It depends to a considerable extent on the testator's property and his relations towards his family. Where the will makes a careful and detailed disposition of the testator's property, and nothing happens to make it probable that he wishes to revoke it, the presumption raised by the disappearance of the will may be rebutted by slight evidence, especially if it is shown that the access to the box, or other place of deposit where the will was kept, could be obtained by persons whose interest it is to defeat the will. In fact, it may almost be said that in such a case the presumption is the other way, namely that the testator did not intend to die intestate. . . ."

■■ Applying the foregoing principles to the facts of the case at bar, we think that the overwhelming weight of the evidence shows that Vera White, after executing her will, did not revoke it and had no intention of revoking it, and that such evidence amply rebuts the presumption arising by reason of the fact that the will was not found after her death.

■■ In determining whether Vera disposed of her property as she desired to dispose of it, it is important to consider the relationship of the parties. In Re Vail's Will, 87 So. 2d 68. The devisees in her will are her blood kin with whom she was on affectionate terms. They were the natural objects of her bounty. The contestants are the blood relatives of her husband. It was entirely rea-

sonable that she should prefer her own blood relations over those of her husband. The proponents are daughters of the testatrix's sister, Jane, and William Wayne, a relative whom she had reared. In a letter to Blanche Thompson dated April 1, 1953, Vera wrote: ''You all will get everything I got.'' In another letter to Blanche, dated March 20, 1954, she wrote, ''Everything I got when I die, it is going to you all.'' She told Muggie Barnett that she had everything fixed all right for Jane's children. There is no evidence of the intention of Vera to dispose of her property other than as she did, except the testimony of James Pendleton, that she told him that she was going to will her property to him about six months before she died, and ''if she ever got able'' she was going down and make her will accordingly, and further told him this every week until about two weeks before she died. Aside from the fact that this witness' testimony does not ring true, it is greatly discredited by the fact that after Vera died and before she was buried, he procured from Tom White, while the latter was mentally incapacitated, a conveyance of all of the property here involved, necessitating a suit in chancery to have such conveyance set aside. It was at this witness' house that Vera spent the latter weeks of her life and kept under her bed her black handbag in which she had been known to have her will. The bag was accessible to Pendleton, who was interested in destroying the will and having the property descend by inheritance to Tom, from whom he endeavored to obtain a conveyance of the entire property. It is true that Rice Tate testified that in the latter part of May or first of June, 1954, he went with some white people to see Vera about buying her land, and that he asked Vera on this occasion if she had a will, and she said that she did not and that she would sell her property to whom she pleased. This testimony, however, is of little weight in view of the fact that subsequently in July, 1954, the will was seen in Vera's possession.

We do not deem it necessary to make a more detailed statement of the facts disclosed by the evidence. In our opinion, it is entirely deducible from the evidence that Vera died believing that her will still reposed in her handbag where she was accustomed to carrying it. It is our conclusion that the overwhelming weight of the evidence rebuts any presumption that Vera destroyed her will with the intention to revoke it and that the learned chancellor's decision to the contrary is erroneous and manifestly wrong. Accordingly, the decree of the court below is reversed and judgment rendered here for the appellants.

Reversed and judgment rendered here for appellant.

All Justices concur, except *Roberds, J.*, who dissents.

ROBERDS, *P. J.* dissenting:

The chancellor was on the ground. He personally saw and heard the witnesses testify. He was in much better position to pass upon the credibility of the witnesses and evaluate the weight of their testimony than are the members of this Court. I dissent because I think he had substantial evidence to support his conclusions.