644 So.2d 1189 (1994)
In the MATTER OF the ESTATE of Hattie Aston TALLANT, Deceased, Genola Tallant Smith, Milton A. Tallant, Luther Jeff Tallant, and Milton A. Tallant, Jr.,
v.
Charlene S. TALLANT, Executrix of the Estate of O.J. Tallant, Jr., and Lana Tallant Hallman.
In the Matter of the ESTATE OF Hattie Aston TALLANT, Deceased, Genola Tallant Smith
v.
Charlene S. TALLANT, Executrix of the Estate of O.J. Tallant, Jr., Milton A. Tallant and Lana Tallant Hallman.
Nos. 92-CA-00859, 91-CA-01045.
Supreme Court of Mississippi.
September 29, 1994.
Rehearing Denied December 1, 1994.
*1190 Michael B. Gratz, Paul S. Funderburk, Tupelo, for appellant.
James B. Floyd, III, Tupelo, C. Michael Malski, Carnathan & Malski, Amory, for appellee.
Before PRATHER, P.J., and BANKS and SMITH, JJ.
BANKS, Justice, for the Court:
This consolidated case involves the probate of a copy of a will where the original was not found after the testator's death. We find manifest error in the chancellor's conclusion that the proponent of the will did not overcome the presumption of revocation with the necessary clear and convincing evidence. We, therefore, reverse and render.

I.
On December 28, 1990, two days after her 80th birthday, Hattie Aston Tallant (Tallant), widow and resident of Pontotoc, Mississippi, died. Her heirs-at-law were daughters, Genola Tallant Smith of Pontotoc and Lana Tallant Hallman of Tupelo, and sons, O.J. Tallant, Jr., and Milton A. Tallant, both of Pontotoc. At the reading of the will on January 3, 1991, the key to Tallant's safety deposit box could not be located, so the box was drilled opened. Once opened, the parties found that the box was empty. Lana, one of heirs, presented a will dated February 18, 1986, which she stated that she found at Tallant's home after her funeral. However, Houston (an attorney) read from his copy of the September 18, 1990, will. After a reading of the September 18, 1990, will, Houston, Milton, Genola and Harold Craig went to Tallant's house to search for the original will. It was not found. They then went to Tallant's office at the warehouse where the will jacket, without the will, and the key to the safety deposit box were found.
On January 25, 1991, Genola filed a Petition for Probate of Will in Solemn Form and Issuance of Temporary Letters Testamentary using a photocopy as evidence of the form and content of Tallant's will. On February 19, 1991, Genola's three siblings, Lana, O.J., and Milton, along with Milton's two sons, contested the admission of the will to probate. They alleged inter alia that the instrument purporting to be the Last Will and Testament of Hattie Aston Tallant was not a true Last Will and Testament and that Genola Tallant Smith exerted an undue influence and was acting in a fiduciary relationship with the decedent when the purported will was executed.
At trial on June 24, 1991, the proponent first presented Scottie B. Allen, an accountant employed by T. Harold Craig & Company who testified that when Tallant executed her will on September 18, 1990, Tallant was alert and very businesslike. Allen testified further that after Tallant signed the original will, that she, Allen, witnessed her signature, and that thereafter, Tallant "asked Mr. Craig to have two copies made and to mail one of *1191 the copies to Jamie Houston in Jackson, and to keep one copy in his office."
After this testimony, the attorney for the proponent, Michael Gratz, asked that the document be received into evidence, as a copy of an original document bearing the same date. Attorney Malski, one of the attorneys for the contestants, objected to the introduction of this as a copy of the Last Will and Testament of Hattie Tallant until the proponents explained the non-existence of the original will and put on clear and convincing evidence of non-revocation. The chancellor overruled the objection with the admonition that if the proponent did not prove the case, it would be stricken from the record.
Another witness for the proponent, Attorney Jamie Houston, III, partner with Watkins & Eager Law Firm in Jackson, testified that he "represented Ms. Tallant from time to time when she called on me over the period of the last seven or eight years in connection with her estate planning, will drafting, and in connection with certain matters regarding Pontotoc Warehouse Company." He stated that in August of 1990, he went to Pontotoc to meet with Ms. Tallant about a debt that her son, O.J. Tallant, Jr., owed to the First National Bank of Pontotoc in the amount of $400,000 and concerning revisions to her will. He explained that:
I had brought to Ms. Tallant a draft of a will that included some revisions from her prior will, and essentially that draft would have  under the terms of that draft O.J. Tallant, Jr., would have been treated exactly like Lana Tallant Hallman was treated under Ms. Tallant's existing will, in that he would have received a bequest of five hundred dollars which was exactly the same treatment that Lana Hallman had under Ms. Tallant's will in existence at that time. Genola Tallant Smith would have received the house, Ms. Tallant's house. And the balance of the estate, that is the residuary estate, would have been distributed equally to Genola Tallant Smith and Milton Tallant outright. I delivered that draft to Ms. Tallant that day, and we talked about that, and we discussed what she wanted to do. And there were several components to the discussion, but she was, of course, concerned and upset because the Pontotoc Warehouse Company was about to have to satisfy O.J. Tallant's Jr.'s debt to the extent of $400,000. And so she wanted to change the treatment of O.J. under her will. At the same time, though, she was concerned about O.J. Tallant's physical condition. She knew that he was in poor health; that he had health problems; and she wanted to do something to make some assets available to O.J. so that he could get medical procedures if he needed surgery or medication, that sort of thing, she wanted to make some assets available to him. She discussed how she could go about this, and we discussed a trust which would be established for O.J.'s benefit. She settled on a figure of a $100,000 to go into this trust which would be created for O.J.'s benefit.
* * * * * *
[Ms. Tallant] wanted to be sure that half of the residuary estate was preserved for Milton's two sons, but she also wanted to help Milton. So we discussed how that could be arranged, and again we came up with the idea of creating a trust for Milton's benefit and for the benefit of his two sons. Under the terms of the will that Ms. Tallant ultimately executed on September 18th, 1990, a trust was created or a trust would have been created or will be created if the will is established under that will for Milton's benefit, and for the benefit of his two sons. And without going into all the details of that, there are two trusts that would be created, one for O.J. Tallant, Jr.'s benefit of a $100,000, and a trust for half of the residuary estate for the benefit of Milton Tallant and his two sons, which when Milton's youngest son reaches age thirty (30), would be distributed in equal shares to the two sons.
Houston stated that on the morning of September 18, 1990, after Tallant began reading the will, Tallant and Craig telephoned him about a question Tallant had on the funding and administration of the trust for O.J. In a subsequent conversation on that day, he received another call from Craig's office where he was told that Tallant was satisfied with the will in the form that he *1192 sent and that she had executed it. He stated that within a couple of days after the execution of the will, he received a copy of Tallant's will from Craig's office.
In response to the question of who would gain if Tallant's will was revoked, Houston stated that they never discussed revocation, since Tallant always had a will. He stated that he "suggested to her that she keep [her will] in her safety deposit box. I might add to that answer, Mr. Gratz, I had suggested that to her in connection with a previous will. I don't know that I had absolutely said that in connection with the execution of the September 1990 will." Then who had access to Tallant's office? Houston responded, "I believe Genola Tallant Smith had access to the office. I believe Milton Tallant had access to the office. I don't know whether Lana Hallman or O.J. Tallant, Jr. would have had access to the office."
Lynn P. Smith, private investigator, testified that at the request of Mike Gratz, attorney for the proponent, he searched the Tallant's residence on May 2 and 3, 1991. He stated that he was not able to complete the search, because the search was interrupted when Milton, O.J. and Lana objected to the search.
Thomas Harold Craig, certified public accountant, testified that Tallant's net worth was a million, seven hundred and twelve thousand, five hundred and eighty-nine dollars ($1,712,589.00). He stated that around August 15, 1990, Tallant contacted him in regard to her wish to have a new will drawn and at that time, he contacted Houston in Jackson. Craig stated that Tallant "want[ed] to equalize what each of her children had received versus what they would receive upon her death." Additionally, he stated that Tallant wanted to do the right thing in behalf of each of her four heirs. In explanation, Craig testified that Tallant wanted to change her will after she learned that sixty percent (60%) of her company was guaranty for the payment of the $400,000.00 note executed by O.J. He also explained that Lana was left $500 in Tallant's will because she received her inheritance in a lawsuit that she had filed against Pontotoc Warehouse and others.
Craig testified that there was a particular area of the will that Tallant did not like. He stated that Tallant made it known that, as to the $100,000.00 trust that was set up with Genola as trustee or custodian in behalf of O.J., Jr., Tallant did not like that particular aspect of the will. On the day that she executed the will, Tallant asked him to call Houston. Tallant "talked with Jamie Houston at length and he couldn't come up with anything more, and so she said, well, I will sign this will, but I don't like that feature of it, and y'all try to come up with something that will substitute."
Finally, Craig stated that on December 14, 1990, (two weeks before Tallant's death) Tallant asked him if he had come up with a way of handling O.J.'s monies to be set aside and he told her that he had not. He then stated that she told him "I wish that you could come up with a way to handle that" to which Craig stated that he said "well, there is no way other than a corporate trustee or an individual trustee." Tallant then responded "I don't want either one of those." On cross, Craig stated that the proponent's son, Bryson Smith, was convicted and served time for theft of cotton from the Pontotoc Warehouse. He also stated that Tallant was wrestling hard with the will and particularly with the fact that Genola was listed as trustee. On redirect, Craig again stated that he assumed that the will was still in existence on December 14, 1990, because Tallant was concerned about a particular aspect of the will.
Reverend Will Howie testified that on the morning of January 3, 1991, before the reading of the will, he observed Lana and Milton searching Tallant's house to see if they could find the document. He could not say that they found the will.
Next Genola, proponent of the will, testified that on December 30, 1990, approximately four and a half hours after her mother was buried, her brother, O.J., pointed a double barrel shotgun at her and demanded her mother's will. She stated that at that time she had not seen the will, neither did she know of its contents. She also testified that on the night of December 30, 1990, her brothers and sister went in Tallant's house to *1193 look for the will and that on that same day, they changed the locks on the house.
In response to conversations about the need for a will, the following colloquy transpired:
Q: Did you ever have a conversation regarding the need for wills with your mother?
A: Yes, sir. That dates back to even before my daddy died, too. My daddy gave me some advice. He told me, he said Genola, you need a will, and it needs to be kept up-to-date. And I don't know how many times my mother has repeated this advice that I should always keep my will up-to-date.
On cross, Genola answered that she had no knowledge of her being named trustee of the trust for Milton and his sons until the will was read. She also answered that in December of 1990, she established a trucking company in her sons' names.
With this testimony, the proponent of the will rested, and the contestants moved to dismiss the petition to probate. The court took the motion under advisement and directed that the contestants move forward with their proof.
The contestants called Anthony Tallant, O.J.'s son, who testified that he picked up his grandmother, Hattie Tallant, on Christmas morning to carry her to O.J.'s house for a Christmas meal. En route, Tallant gave Christmas envelopes to her great grandchildren. When the children opened the envelopes, the envelopes were empty. There was a total of about twenty dollars ($20) missing from the envelopes. After learning that the money was missing from the envelopes, Anthony testified that Tallant became very quiet and had to take a couple of nitroglycerin tablets prescribed for her heart condition.
Anthony testified that later that evening, he observed his grandmother at the Pontotoc Warehouse and that he overheard her say "they're not doing me this way again or they can't do me this way again anymore something to that nature," as she came out of the vault.
The contestants then called Don Stutsy, the husband of one of Tallant's granddaughters, who also testified that on Christmas, Tallant was unusually quiet on the morning that she discovered that money was missing from the envelopes. He stated that later that evening, he had a conversation with Tallant wherein she asked him if he knew what happened to the money in the envelopes and he stated "I told her, I said, yes, you know, I heard about it. She said, well, I know who done it, and I'm going to get the money back, and I said, okay."
John Hitchcock, supervisor and assistant manager of Pontotoc Warehouse Company, testified that he had known the Tallant family since early childhood and was allowed to call Tallant "Granny," the name used by most of the family members. On the evening of December 26, 1990, Hitchcock stated that he saw Tallant at the Pontotoc Warehouse sitting at her desk and that the warehouse vault door was unlocked. He stated that when he spoke to her, "She acted like she just rather not talk about it. She acted like she was sort of choked up." He stated that she had papers on her desk going through them, pulling them apart and tearing them up. The papers appeared to be the type used on a copy machine. Additionally, he stated, "She told me that she had to get her business in order, and that she was not pleased with this will."
With this testimony, the contestants rested. Genola, called in rebuttal, testified that her mother was a very careful person who would not show any of her business to the employees. If an employee was present when Tallant began to transact business, Tallant would ask that person to leave. Moreover, she testified that her mother was "at the point of letting [Hitchcock] go" because he created trouble between her mother and her brothers. After Genola's testimony, both sides rested. The contestants renewed the motion for dismissal of the petition to probate the copy of the will. The court reserved ruling and directed the parties to present to the court their proposed findings of fact and conclusions of law.
On August 28, 1991, in a memorandum opinion, the chancellor dismissed the petition for probate of will and concluded that the proponent of Tallant's will failed to rebut the *1194 presumption, by clear and convincing evidence, that Tallant destroyed the will with the intention of revoking it. The court found that "at trial there was ample proof of the destruction of the Will sought to be probated and proof that the testatrix was dissatisfied with her Will. Other than her signature on the day of its execution, there is an absence of any proof that the testatrix ever fully accepted the Will or was satisfied with it." On September 9, 1991, the court entered judgment dismissing the action.
On October 4, 1991, the proponent filed an appeal to this Court. At that time, the sole issue was whether the trial court erred in dismissing the petition for probate of will and concluding that the proponent failed to rebut the presumption by clear and convincing evidence that the testatrix destroyed her will with the intention of revoking it.
On February 21, 1992, three of the contestants/appellees, Milton A. Tallant, Luther Jeff Tallant and Milton A. Tallant, Jr., moved the court for an order setting aside its judgment entered on September 9, 1991, pursuant to Mississippi Rules of Civil Procedure 60(b). The movants alleged that they had newly discovered evidence which would probably produce a different result if the judgment entered on September 9, 1991, was set aside and a new trial granted. Additionally, it was alleged that this newly discovered evidence would show that the judgment may have been based on the perjured testimony of Joe Hitchcock; that the deceased, Hattie Aston Tallant, did not revoke her will by destroying it as testified to by Joe Hitchcock; and that she never destroyed her will but that her will was taken after her death by either Lana Tallant Hallman or her husband, Phil Hallman. The movants asked to be relieved of the judgment in their favor and requested that a new trial be granted, and that the duplicate original of the instrument filed be determined to be the true Last Will and Testament of Hattie Aston Tallant, deceased.
In support of the Motion, the three contestants/appellees, submitted six sworn affidavits showing that fraud and perjured testimony was adduced at the trial level. Further, they proffered the testimony of Clarence Everett "Buddy" Robinson, who would have testified that Hitchcock's testimony was false. On February 27, 1992, Genola filed a petition to join the motion for relief from judgment. On February 28, 1992, the chancellor set the hearing on the motion for relief from judgment for April 29, 1992.
At the hearing, the chancellor stated that the case was already on appeal to this Court and that he would not relitigate the case. "I'm strictly here to see what, if any, additional information anyone wants to put into the record." Although the court stated that all of the information sought to be presented should have been discovered and tried through discovery, the parties were allowed to make a proffer into the record. The original proponent of the will made a proffer of proof that she would show, that as to her, the information was newly discovered and that she should be granted a new trial. Thereafter, offers of proof were made in the form of the affidavits of Milton Tallant, Debra Tallant, Grady Stegall, Matt Tallant, Jeff Tallant, Clarence E. Robinson, and as well as a proffer of what the testimony of Taylor King would have shown. After the proffer, the chancellor found that the movants were not entitled to relief.
This consolidated appeal is taken from the chancellor's finding, the judgment, and the denial of relief from that judgment. Genola Tallant Smith was the petitioner/proponent below and is one of the appellants in this appeal. Milton A. Tallant, Milton A. Tallant, Jr. and Luther Jeff Tallant were contestants below and are now appellants in this appeal. Lana Tallant Hallman and O.J. Tallant, Jr., were two of the contestants and are the remaining appellees.

II.
This Court has held that "Where  as here  a trial judge sits without a jury, [it] will not disturb his factual determinations where there may be found in the record substantial supporting evidence." Snow Lake v. Smith, 610 So.2d 357, 360 (Miss. 1992) (quoting Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1264 (Miss. 1987)). We must "affirm a chancellor on a question of fact unless upon review of the record we be left with the *1195 firm and definite view that a mistake has been made." Snow Lake, 610 So.2d at 360.

III.
In the instant case, the evidence is uncontradicted that (1) Tallant made a will on September 18, 1990; (2) after the will was executed, Tallant left the place of execution with the original will in her possession; and (3) the will was not found after Tallant's death, despite a diligent search of her safety deposit box, her place of residence, and her office. It also is uncontradicted that others had access to the place where the will jacket was found.
In James v. Barber, 244 Miss. 234, 248, 142 So.2d 21 (1962), we stated, "If no will is found at the death of the owner of property, it will be presumed that he died without a will." Later in In the Matter of the Estate of Leggett, we explained:
If a man destroys his will with intent to revoke it, obviously the will will not be found at his death, but the converse does not follow. That a man's will be not found at his death does not necessarily mean he destroyed it nor that he intended revocation. Our concern has been how we should read the circumstantial evidence, and in such an instance, if it be known where a man kept his will, that prior to his death it was last known to be in his possession or subject to his exclusive dominion and control, common experience suggests destruction with intent to revoke the likely explanation. Uncertainties remain, but such cases do arise and must be adjudged and, to the end that they be adjudged on a principled basis, we have made a policy choice. We have created, as a rule of evidence, a rebuttable presumption of destruction with intent to revoke.
584 So.2d 400, 403 (Miss. 1991). In Leggett, after the testator died leaving his entire estate to his sole surviving daughter, the daughter filed a petition to probate the will, using a photostatic copy of the will. Id. at 401. The testator's grandson contested the probate. The Court held that the proponent presented sufficient evidence to rebut by clear and convincing evidence the testator's intent to revoke his will. Id. 405. In so finding, the Court noted that "a testator's intent to revoke `must appear clearly and unequivocally'". Id. at 403.
We have also said,
It is difficult to lay down any general rule as to the nature of the evidence which is required to rebut the presumption of destruction: It depends to a considerable extent on the testator's property and his relations towards his family. Where the will makes a careful and detailed disposition of the testator's property, and nothing happens to make it probable that he wishes to revoke it, the presumption raised by the disappearance of the will may be rebutted by slight evidence, especially if it is shown that the access to the box, or other place of deposit where the will was kept, could be obtained by persons whose interest it is to defeat the will. In fact, it may almost be said that in such a case the presumption is the other way, namely that the testator did not intend to die intestate.
Id. at 403, (quoting 1 Jarman, A Treatise on Wills, Sixth Edition, Chapter VII, page 152, which was quoted with approval in Adams v. Davis, 233 Miss. 228, 102 So.2d 190, 194 (1958)).
In the instant case, the record reveals that in its findings, the court relied on the testimony of the accountant, Craig, who testified that Tallant was not entirely satisfied with her will, specifically, that she was dissatisfied with two aspects of the will. The court also relied on Hitchcock's testimony that two days before her death, Tallant was observed tearing up a document which was on multiple legal-size pages at the same time that she stated that she needed to get her business in order and that she was not satisfied with her will. This occurred at a time when Tallant may have been upset by a theft of a small amount of Christmas money.
The record indicates that Tallant changed her will twice to reflect actions taken by her children. In 1987, Tallant revoked a prior will and left one of daughters, Lana, $500, after Lana sued Tallant and her company in 1986. In 1990, Tallant revoked her 1987 will after her company became the guaranty for a $400,000 loan executed by her son, O.J. She *1196 also left him $500; however, because he was ill, Tallant wanted to ensure that his medical bills were taken care of, thereby leaving him a $100,000 trust under the September 18, 1990, will. In 1977, Tallant's daughter, Genola, began working with her mother at the Pontotoc Warehouse without pay. Under the September 18, 1990, will, Genola would have received one-half of the estate. Finally, Tallant's son, Milton, had been married twice and was engaged to be married a third time. Tallant wanted to ensure that Milton would receive his inheritance, but more importantly that his sons, her grandsons, would share his portion of the inheritance.
Tallant's actions reflect meticulous planning and reasons for the disposition of her estate. There is nothing in the record to suggest a change in her views with regard to her basic plan. Her dissatisfaction had only to do with relatively minor parts of the will, that is, how to handle the trusts that had been established comprised of a total of approximately 11% of her estate.
Moreover, Hitchcock's later statements aside, there is no evidence that the paper that Tallant tore up on the day in question was actually her will. The only evidence that suggests that it might have been her will was her statement concerning getting her business in order and not being satisfied with her will. Simply tearing up her will to revoke it would have been grossly inconsistent with her actions at other times when she revoked prior wills. In each of those instances, Tallant was very deliberate and took great pains to see that she had a new will before revoking the prior will. Additionally, it was at her express direction that copies of her will were kept by her lawyer and her accountant, evincing an intent that the will not be defeated by the loss of the original.
Although there is some slight evidence from which the chancellor could have inferred that Tallant revoked her will, we find that the great weight of the credible evidence supports a finding that the proponent overcame the presumption of revocation by clear and convincing evidence. We therefore reverse and render. Because of this disposition the appeal from the order denying relief from judgment is rendered moot and will be dismissed as such.
REVERSED AND RENDERED.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN and SMITH, JJ., concur.
McRAE, J., dissents with separate written opinion, joined by DAN M. LEE, P.J.
JAMES L. ROBERTS, Jr., J., not participating.
McRAE Justice, Dissenting:
In this reversal, the majority fails to adhere to this Court's standard of review. The majority readily admits that there exists evidence which supports the contestant's claim and the chancellor's findings that Hattie Aston Tallant revoked her will, but, nonetheless, reverses and renders. Accordingly, I dissent.
We have a rebuttable presumption of destruction with intent to revoke where no will is found at the death of the owner of property. In the Matter of the Estate of Leggett, 584 So.2d 400, 403 (Miss. 1991). After execution of her September 18, 1990 will, Tallant was given the original. The original was never found. In this case, the record reveals that the lower court relied upon the testimony of Thomas Harold Craig, Tallant's accountant, in deciding for the contestants. Craig advised Tallant's lawyer of her financial status when he drafted the will. Craig testified that Tallant was dissatisfied with the will and only signed it upon the condition that it be revised. Tallant had expressed dissatisfaction with previous wills in the past and revoked them.
The lower court also relied upon the testimony of John Hitchcock, Tallant's employee. Hitchcock testified that he observed Tallant two days before her death tearing up a document which was on multiple legal-size pages while at the same time, stating that she was not satisfied with her latest will.
This Court has repeatedly held that a chancellor may only be overturned where his judgment was manifestly wrong or there was not enough substantial, credible evidence to support his conclusions. Smith by Young v. Estate of King, 579 So.2d 1250, 1251 (Miss. 1991); Bell v. Parker, 563 So.2d 594, 596-97 *1197 (Miss. 1990); Bowers Window and Door Co., Inc. v. Dearman, 549 So.2d 1309, 1313 (Miss. 1989); Bullard v. Morris, 547 So.2d 789, 791 (Miss. 1989); Johnson v. Hinds County, 524 So.2d 947, 956 (Miss. 1988); Culbreath v. Johnson, 427 So.2d 705, 707-08 (Miss. 1983). Specifically, this standard of review has been applied by this Court in the will contest arena. Estate of Blount v. Papps, 611 So.2d 862, 867 (Miss. 1992); Collins By Smith v. McMurry, 539 So.2d 127, 129 (Miss. 1989).
This Court, as an appellate court, does not sit as a super chancellor. We are not allowed to pick and choose only those facts necessary to reach a preferred conclusion. To the contrary, it is incumbent upon this Court to consider the entire record and to accept all the facts and reasonable inferences which support the chancellor's findings. Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987). Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983). A chancellor is the sole judge who hears the testimony of the witnesses and observes their demeanor in order to ascertain their credibility. Mullins, 515 So.2d 1183, 1189 (Miss. 1987). Such function is never more important than in a will contest where parties to an action stand to gain or lose monetary and sentimental assets.
The chancellor weighed all the evidence presented, and it is not for this Court to determine that his decision, absent an erroneously applied legal principle or abuse of discretion, should not be given credence. Therefore, I respectfully dissent.
DAN M. LEE, P.J., joins this dissent.