# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00900-COA

MICHEAL TAYLOR, EXECUTOR OF THE                APPELLANT
ESTATE OF MARY MARKWELL, DECEASED

v.

CHERYL MARKWELL TOLBERT                        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 07/08/2021 |
| TRIAL JUDGE: | HON. PERCY L. LYNCHARD JR. |
| COURT FROM WHICH APPEALED: | TATE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JOHN THOMAS LAMAR JR. |
| | TAYLOR ALLISON HECK |
| ATTORNEYS FOR APPELLEE: | JERRY WESLEY HISAW |
| | JOSEPH M. SPARKMAN JR. |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 06/28/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., LAWRENCE AND McCARTY, JJ.

### CARLTON, P.J., FOR THE COURT:

¶1.     Mary Markwell executed a will in 2014. She died on November 15, 2019. Appellant Micheal[1] Taylor is her grandson and the sole beneficiary under her will. The Chancery Court of Tate County granted Taylor's petition to probate a copy of his grandmother's will when the original will could not be found at her death. Appellee Cheryl Tolbert, Markwell's daughter, objected. After a bench trial solely on the probate issue, the chancery court entered

---

[1] Taylor's first name is spelled inconsistently as "Micheal" and "Michael" throughout the record. We use "Micheal," consistent with the spelling in Taylor's signature on documents.

an order setting aside and dismissing its probate order, finding that the lost will had been revoked. In so finding, the chancery court applied the rebuttable presumption of revocation by destruction that arises when a will is known to have existed and was in the maker's possession, but it cannot be found after the maker's death. *See, e.g., Berry v. Smith* (*In re Est. of Leggett)*, 584 So. 2d 400, 403 (Miss. 1991). The chancery court found that Taylor had failed to rebut that presumption by clear and convincing evidence.

¶2.     The chancery court subsequently certified its order setting aside the probate of Markwell's will as a final judgment. *See* M.R.C.P. 54(b). Taylor appeals, asserting that the chancery court erred in applying the revocation presumption or, alternatively, in failing to find that Taylor presented sufficient evidence rebutting that presumption. Finding no error in the chancery court's judgment, we affirm.

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

¶3.     Markwell executed a last will and testament on July 17, 2014, at the law office of her family attorney, John T. Lamar Jr. Lamar kept a copy of the will and, as the chancellor found, the original will was given to Markwell at that time. Taylor, Markwell's grandson, was the sole beneficiary under Markwell's will. Markwell died on November 15, 2019. Four days later, when Markwell's original will could not be found, Taylor filed a petition to have a copy of her will probated. A copy of Markwell's will and a sworn proof of will were attached to the petition. The chancellor granted the petition, entering an order on November 20, 2019, admitting the copy of Markwell's will to probate and appointing Taylor as executor

2

of Markwell's estate.

¶4. On January 3, 2020, Tolbert, Markwell's daughter, filed a petition seeking to set aside the probate of the will, asserting that Taylor had failed to present the proof necessary to allow a copy of a will to be admitted to probate. A bench trial was held in July 2020, addressing only whether Markwell's will was properly admitted to probate.

¶5. At trial, the chancellor heard the testimonies of Taylor; Taylor's girlfriend of four years, Amber Chambers; Taylor's paternal grandmother, Peggy Taylor; Tolbert; and Tolbert's boyfriend of two years, Justin Sowell.

¶6. All witnesses agreed that Markwell was a strong-willed, independent woman who did not tell many people about her personal business. Markwell's husband had predeceased her by about twenty years, and she lived alone in her home from that time up until the last months before she died.

¶7. Taylor testified that he did not know his grandmother had executed a will until after she died and he obtained a copy of the will from Lamar. Tolbert also testified that she did not know about the will. Both Taylor and Tolbert testified that neither of them were on any of Markwell's checking accounts, and neither of them knew of anyone else who was.

¶8. About six months before she died, Markwell's daughter, Cindy, moved in with her, and the record also reflects that Tolbert and her boyfriend Justin cared for Markwell before her death. As addressed below, there is conflicting testimony about when Tolbert and Justin started caring for Markwell at her home. Markwell was hospitalized on November 8, 2019,

3

and died on November 15.

¶9. Regarding his relationship with his grandmother, Taylor testified that he lived a quarter of a mile down the road from Markwell and visited her "almost daily." According to Taylor, from the time his grandfather died in 1998 up until October or so of 2019, he took care of his grandmother's property, cutting her grass and bush hogging the surrounding property. He also took her to the doctor on occasion. Amber, Taylor's girlfriend, corroborated this testimony. According to Taylor, around the summer of 2019, Tolbert and her boyfriend started taking care of things at Markwell's home and taking her to appointments.

¶10. Taylor testified that sometime in 2017, Markwell brought out her lock box and opened it on the kitchen table in Taylor's presence. The box locked with a key, and Markwell kept the key in her purse on a key ring. Taylor said that the lock box contained $45,000 in cash, some silver certificates, some old coins, and some paperwork. He said that he and his grandmother did not go through the paperwork in the lock box. He admitted that he did not see Markwell's original will in the lock box, but he added, "I feel like that's where it was."

¶11. Again, when specifically asked by the chancellor, "You never saw that original will at any time, did you?", Taylor answered, "No, sir." He testified that all he knew was that his grandmother told him "to go see John Lamar if anything ever happened to her." Taylor also testified that his grandmother told him to get the lock box and "run with it" when she died because "[t]hat's where the money was."

4

¶12.  Per his grandmother's instructions, after Markwell died Taylor went to Lamar's office where Lamar had a copy of Markwell's will and gave it to Taylor.  As noted, Taylor testified that he did not know that Markwell had executed a will in 2014; he said he "had no idea about a will" until he went to Lamar's office after Markwell died and Lamar gave him the copy of the will.

¶13.  Lamar told Taylor to go to Markwell's house and look for the original will.  Taylor testified that he did not find the original will at Markwell's house and the lock box was missing.  Taylor further testified that Tolbert and Justin, as well as his Aunt Cindy, had free access to Markwell's home in the last months before Markwell's death and Tolbert had access to Markwell's purse that had her keys in it.  Taylor had testified that the key to the lock box was on a key ring, but he admitted he had not seen the key ring—or the lock box—since his grandmother showed him the contents of the lock box in 2017.

¶14.  Taylor also testified that after the funeral some members of the family gathered at Markwell's home.  His Aunt Cindy asked if Markwell had a will and Tolbert said that Markwell had "papers."  Taylor testified that he had already gotten a copy of Markwell's will from Lamar, so he decided to tell Tolbert what it said.  According to Taylor, Tolbert "said she had already seen it."  Amber also testified that she heard Tolbert tell Taylor that she already knew what was in Markwell's will.  Taylor said that after the funeral he "asked [Tolbert] about the lock box, and she said that nobody found it."  In this same conversation, Tolbert also told him that his grandmother "had paid off [Tolbert's] son's school, paid off

5

his tools, and wrote her [(Tolbert)] a check for $64,000, and that she wanted to change the will."

¶15.    Peggy Taylor, Taylor's paternal grandmother, testified that she and Markwell were very close for the last fifteen years of Markwell's life. In 2014, Markwell told her that she had made a will and that everything was going to Taylor. Peggy said that Markwell told her that she gave everything to Taylor because her children had already received their share of her estate. Peggy also testified that Markwell told her about two weeks before Markwell died that Taylor wanted to hang the new television she had bought on the wall, and that she had agreed because it was "going to be his."

¶16.    Tolbert testified that she had basically taken over as Markwell's primary caregiver during Markwell's final illness. According to Tolbert, from 2017 until her mother passed away she would take her to doctor visits and see her at least weekly because she also had to "cut the grass." Tolbert said she never saw or knew about a lock box. Tolbert testified that she did not know that Markwell had a will, but that in 2017 her mother told her "that she had made paperwork out and put everything in [Taylor]'s name, and he had stopped doing everything he told her that he was going to do." According to Tolbert, the agreement between her mother and Taylor was that "he kept the grass cut, the pasture bush hogged, and anything fixed around the house that she needed done," and that Taylor stopped doing that in 2017.

¶17.    Tolbert further testified that after the funeral, she told Taylor that her mother told her

6

"she had paperwork and . . . she wanted it changed." Tolbert testified that "at her mother's direction," she filled out a check for $64,000 in her name that her mother signed, and she filled out another check for approximately $23,000 in payment for her son's student debt, signed by her mother. The check for $64,000 was stated to be for "funeral bills and expenses."

¶18. Justin also testified. He said that he was at the hospital with Tolbert and Markwell (in the final week before she died) and Markwell said that she wanted to make a will. He believed that Markwell knew her time was near. He went to the nurses' station to get a notary, but they did not have one. Nothing more was said about a will before Markwell died.

¶19. After hearing the evidence presented and reviewing the applicable law, the chancellor ruled that Taylor had failed to rebut the presumption that a lost will has been revoked by destruction where it was last known to have been in its maker's possession and cannot be found after her death. The chancellor therefore "[found] . . . that the probated . . . copy of the will was improper and is hereby set aside and dismissed." On August 12, 2020, the chancery court entered its "Order Setting Aside Previous Order Probating Will and Issuing Letters Testamentary" that embodied its July 28, 2020 ruling from the bench. Details of the chancellor's ruling are discussed in context below. The chancery court subsequently certified its August 12, 2020 order as a final judgment pursuant to Rule 54(b). Taylor appeals.

## STANDARD OF REVIEW

¶20. This appeal concerns the probate of a copy of Markwell's will where Markwell's

7

original will could not be found after her death. Taylor asserts that the chancellor erred in applying the presumption of revocation in this context or, alternatively, that the chancellor erred in failing to find that Taylor rebutted this presumption. We review de novo "all questions of law decided in chancery court." *Adams v. Carney* (*In re Est. of Carney*), 758 So. 2d 1017, 1020 (¶12) (Miss. 2000). Regarding a chancellor's findings of fact, "[w]here—as here—a trial judge sits without a jury, [this Court] will not disturb his factual determinations where there may be found in the record substantial supporting evidence." *In re Est. of Tallant*, 644 So. 2d 1189, 1194 (Miss. 1994).

¶21. In discussing whether the will proponent had rebutted the revocation presumption in *Estate of Tallant*, the supreme court recognized that the appellate court "must affirm a chancellor on a question of fact unless upon review of the record we be left with the firm and definite view that a mistake has been made." *Id.* at 1194-95 (internal quotation marks omitted). In this regard, "[w]e must examine the entire record and accept that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact." *Est. of Crowell v. Est. of Trotter*, 151 So. 3d 194, 198 (¶19) (Miss. 2014) (internal quotation marks omitted). "[T]he trial judge, sitting in a bench trial as the trier of fact, has sole authority for determining credibility of the witnesses." *Id.* at 198-99 (¶19).

## DISCUSSION

¶22. When a will is known to have existed and was in the maker's possession, but it cannot

be found after the maker's death, the Mississippi Supreme Court has stated that a rebuttable presumption arises that the maker destroyed the will with the intent to revoke it. *Abshier v. Chapman* (*In re Est. of Mitchell*), 623 So. 2d 274, 275 (Miss. 1993). The supreme court delineated the contours of this presumption as follows:

> [The presumption] arises when the evidence shows (a) the would-be testator made a will, (b) last known to have been in its maker's possession prior to his death, but (c) not found after death despite diligent search. Where these facts be found and not rebutted, our law presumes that the decedent before his death revoked his will by destroying his will.

*Est. of Leggett*, 584 So. 2d at 403. Continuing, the supreme court stated, "[e]mploying good Latin legalese, we say he 'destroyed it animo revocand[i].'" *Id.* (quoting *Willis v. Willis* (*In re Est. of Willis*), 207 So. 2d 348, 349 (Miss. 1968)). As noted, the revocation presumption is rebuttable. *Est. of Mitchell,* 623 So. 2d at 275.

¶23. Taylor asserts that the chancellor erred in relying on the revocation presumption or, alternatively, even if the revocation presumption were applied, he offered sufficient evidence to rebut it. For the reasons addressed below, we find that both assignments of error are without merit. We turn now to discuss Taylor's first assignment of error. We address the alternate issue in the following section.

## I.     Establishment of a Presumption of Revocation

¶24. As addressed above, the supreme court has set forth three factors establishing a presumption of revocation: "[The presumption] arises when the evidence shows (a) the would-be testator made a will, (b) last known to have been in its maker's possession prior

9

to his death, but (c) not found after death despite diligent search." *Est. of Leggett*, 584 So. 2d at 403. Applying these factors, the chancellor found that the revocation presumption arose where (a) Markwell "made a will" in 2014, (b) the "[will] was certainly executed in the office of Mr. Lamar and given to [Markwell] at that time in 2014 [although] . . . [t]here [was] no evidence before [the chancellor] as to where that will was kept, in whose possession, or otherwise "; and (c) Markwell's will was not found after her death.

¶25.    We find no error in the chancellor's applying the revocation presumption based upon these findings. There is no dispute that Markwell executed a will in 2014. And Taylor does not take issue with the chancellor's finding that the "[will] was certainly executed in the office of Mr. Lamar and given to [Markwell] at that time in 2014." Taylor, however, asserts that because the chancellor found that "[t]here [was] no evidence before [him] as to where the will was kept, in whose possession, or otherwise," this means that the revocation presumption never arose because the "possession" factor was not met.

¶26.    We find that Taylor's assertion on this point is without merit. Taylor takes this portion of the chancellor's ruling out of context. Reading the court's ruling as a whole, the chancellor found that Markwell prepared a will in 2014, the original will was given to Markwell at that time, and it was therefore "in her possession" in 2014. That the chancellor found he had no evidence before him regarding the whereabouts of the original will *after* that time only serves to illustrate the sparse proof presented in this case. It does not diminish the chancellor's finding that Markwell "possessed" her original will when it was prepared in

10

2014. This constitutes sufficient evidence establishing the revocation presumption. *See Easley v. Ferguson* (*In re Est. of Cannon*), 733 So. 2d 245, 248 (¶18) (Miss. 1999) (presumption arose where testatrix left her lawyer's office with the original of her will, though presumption rebutted by other evidence); *Est. of Willis*, 207 So. 2d at 349 (presumption arose where the evidence showed that the will was in the possession of the testator and "there was no evidence that he ever parted with possession"); *Dowdy v. Smith* (*In re Est. of Dowdy*), 818 So. 2d 1255, 1258 (¶11) (Miss. Ct. App. 2002) (recognizing that the "presumption was established by evidence . . . [where] [i]t [was] undisputed that [the testatrix] had the will in her possession prior to her death [and] the original has yet to be found"). Accordingly, we find no error in the chancellor's reliance on the presumption in this case.

## II. Rebuttal of Presumption of Revocation

¶27. In general, the "[revocation] presumption can only be overcome by clear and convincing evidence" that the maker did not intend to revoke her will. *Est. of Cannon*, 733 So. 2d at 248 (¶13); *Est. of Mitchell*, 623 So. 2d at 277; *Est. of Leggett*, 584 So. 2d 403. We find that this standard applies here.[2] The supreme court has stated that the rebuttable

---

[2] We recognize that in *Estate of Dowdy*, this Court stated that "[the revocation] presumption can be defeated with slight evidence when it can be shown that contestants of the will had access to it," 818 So. 2d at 1258 (¶11), citing *Estate of Tallant*, 644 So. 2d at 1195, for this proposition. As an initial matter, we observe that the supreme court in *Estate of Tallant* actually utilized a "clear and convincing evidence" standard in reversing the chancellor's determination that the revocation presumption had not been rebutted. *Id.* at 1196. The supreme court held: "Although there is some slight evidence from which the

11

presumption of revocation is "not overcome merely 'by proof that persons injuriously affected by the will had opportunities to destroy it.'" *Est. of Leggett*, 584 So. 2d at 403 (quoting *James v. Barber*, 244 Miss. 234, 248, 142 So. 2d 21, 27 (Miss. 1962)).

¶28.   The chancellor announced his findings with respect to the rebuttal issue as follows:

> The facts presented today show, number one, that [Taylor] acknowledges that he has no proof of the whereabouts at any time of the [original] will, mainly because he has never seen it . . . .
>
> Number two, he acknowledges that he has no proof that [Tolbert] herself ever saw it or possessed [it], nor even knew where it was, nor is there any evidence as to its location. There's certainly a lot of presumptions that it was with some other documents, either in a lock box or in a safe, but no evidence that places the will even in the possession of the testator [since 2014].
>
> Number three, though contestant as well as many others had access to the house where the will was allegedly kept, no one ever saw the original, and [Taylor] acknowledges [that there is] no evidence that anyone removed it

---

chancellor could have inferred that Tallant revoked her will, we find that the great weight of the credible evidence supports a finding that the proponent overcame the presumption of revocation *by clear and convincing evidence*. We therefore reverse and render." *Id.* (emphasis added).

In any event, even if the "slight evidence" burden of proof were applicable under some circumstances, this is not such a case. As the record reflects, there is conflicting evidence whether Tolbert even knew a will existed. More importantly, even if she did, there is no evidence she knew where the will was kept. Indeed, as the chancellor found, even Taylor never saw the original will and offered only speculation that it was kept in the lock box. Although a number of persons had access to Markwell's home, in general, there has simply been no showing that the "contestants of the will had access to it" because, as the chancellor found, there is no evidence that anyone knew where it was. As such, we follow the majority of cases in which the courts have applied the "clear and convincing evidence" standard in analyzing whether the will proponent rebutted the revocation presumption. *See, e.g.*, *Est. of Cannon*, 733 So. 2d at 248 (¶13); *Est. of Mitchell*, 623 So. 2d at 277; *Est. of Leggett*, 584 So. 2d at 403.

12

therefrom, although he speculates.

> With the sparse proof before me, it is impossible to make a dramatic leap based on speculation and innuendo that [Markwell] did anything other than revoke the will. [Markwell] spoke to her daughter about preparing another will on her deathbed, not about revoking that will. Only [Taylor's] girlfriend has any recollection of anyone saying anything about [Markwell] wanting to revoke the will at that point in time, although she indicated she would like to make a will.

> There's little known about the will after 2014 when it was prepared and delivered to the testator . . . at the time it was executed. . . . We can only speculate as to the desires and actions of [Markwell] . . . . I find that the probated will—or, rather, the copy of the will[—]was improper and is hereby set aside and dismissed.

¶29. As we have observed above, in reviewing this issue, we "must affirm a chancellor on a question of fact unless upon review of the record we be left with the firm and definite view that a mistake has been made." *Est. of Tallant*, 644 So. 2d at 1194-95 (internal quotation marks omitted). Bearing in mind this deferential standard of review, we find no error in the chancery court's finding that Taylor failed to rebut the revocation presumption by clear and convincing evidence in this case.

¶30. Taylor, however, asserts that the facts of this case are "eerily similar" to those in *Estate of Leggett*, 584 So. 2d at 403-05, a case in which the supreme court found that based upon the evidence presented, the chancery court "could reasonably have found, by clear and convincing evidence," that the will proponent rebutted the revocation presumption. *Id.* at 405. Taylor asserts this Court should likewise find he rebutted the presumption by clear and convincing evidence here.

13

¶31.    We disagree.  In *Estate of Leggett* the supreme court *affirmed* the chancery court's determination on the rebuttable presumption.  *Id.*  In this case, Taylor asks this Court to *reverse* the chancery court on the same issue.  As such, given our deferential standard of appellate review, even if *Estate of Leggett* were squarely on point, that does not necessarily support a finding by this Court that the chancery court erred in finding that Taylor failed to rebut the revocation presumption here.  In any event, we find that the facts in *Estate of Leggett* are distinguishable.  Indeed, compared to the facts before the chancellor in this case, the circumstances in *Estate of Leggett* illustrate precisely why Taylor failed to rebut the revocation presumption here.

¶32.    In *Estate of Leggett*, Felson Leggett executed his will in 1982, leaving his entire estate to his daughter, Jackie Smith.  *Id.* at 401.  Regarding the will's location, all witnesses believed that "Leggett took the will and placed it under lock and key in a roll-top desk in the living room in his home . . . [and] that the day he signed his will Leggett gave his daughter a photostatic copy of it."  *Id.*  Leggett spent his last days in a nursing home and died in 1988. *Id.* at 402.  His original will was never found.  *Id.*

¶33.    When Smith sought to probate the copy of the will that her father had given her, Leggett's grandson, Carl Berry, objected, raising the revocation presumption.  *Id.*  After a trial on the issue, the chancellor probated the copy of the will, finding that "the overwhelming weight of the evidence" rebutted any presumption that Leggett had destroyed the original will.  *Id.*

14

¶34. The supreme court affirmed, stating, "we perceive the evidence such that the Chancery Court could reasonably have found, by clear and convincing evidence, that Felton Leggett . . . neither destroyed nor revoked his will." *Id.* at 405. In reaching this conclusion, the supreme court noted the chancellor's "pivotal evidentiary finding" that "*Leggett kept his will in a locked drawer in his roll-top desk where it remained until sometime in October of 1988*, when entrance was gained to the drawer by a party or parties unknown and the contents thereof removed." *Id.* at 404 (emphasis added).

¶35. No such finding was made in this case. On the contrary, the chancellor in this case found there was *no evidence* "as to [the will's] location," but only "presumptions" and speculation that it was found among papers in a lock box or safe. Although a number of people had access to Markwell's home, the chancellor pointed out that no one had ever even seen the original will. Thus the "pivotal evidentiary finding" in *Leggett* does not even exist in this case.

¶36. Other factors the supreme court found relevant in *Leggett* include: (1) Leggett gave his daughter a copy of his will on the day he executed it, *id.* at 401; (2) "Leggett talked to people about his will[,]" *id.* at 404; (3) "[Leggett] had a close and affectionate relationship with his daughter, Jackie Smith, *and . . . this continued into his later years*[,]" *id.* (emphasis added); (4) Leggett "frequently told others he was leaving his entire estate to Smith," *id.*; (5) the chancellor's finding that "[t]here is nothing in the record suggesting [Leggett] may have changed his mind," *id.*; and (6) the chancellor's finding that "a very poor relationship existed

15

between Mr. Leggett and his grandson [Berry (the objector)]," *id.* at 404-05.

¶37. In contrast to these factors in *Leggett*, although Markwell told Peggy Taylor *in 2014* that she had made a will and left her property to Taylor, there is no other evidence that she told anyone else. Although Tolbert testified that in 2017 her mother told her about some "paperwork" leaving her property to Taylor, Tolbert also testified that her mother told her she wanted to change that "paperwork." As for Taylor, he testified that Markwell never told him about her will, although she told him (at some unspecified time) to see John Lamar if something should happen to her. Even when Markwell showed Taylor her lock box in 2017, she did not go through the "paperwork" in that box with him, she did not tell him about her will, and she did not tell him her original will was in that box.

¶38. As for the relationship between Markwell and Taylor, although Taylor testified about the work he did for his grandmother and his frequent visits with her that, according to Taylor, continued up until October 2019, even Taylor admitted that Tolbert and Justin were Markwell's primary caregivers in Markwell's last months. Indeed, according to Tolbert, she and Justin began taking care of Markwell and her property in 2017 and it was around this time that Markwell told Tolbert she wanted to change her "paperwork" regarding Taylor. And unlike the "very poor relationship" between Leggett and his grandson in *Estate of Leggett*, there is no evidence that Tolbert and her mother did not get along.

¶39. Finally, in *Estate of Leggett*, there was "nothing in the record" suggesting the decedent wanted to change his mind about his estate. But here, the chancellor specifically found that

16

Markwell had "spoke[n] to her daughter [and Justin] about preparing another will on her deathbed, not about revoking [a prior] will," and, as noted, Tolbert also testified that her mother had also talked to her about "want[ing] paperwork changed" concerning Taylor.

¶40.    In short, we find the circumstances in *Estate of Leggett* entirely distinguishable from the circumstances in this case. Based upon our own review of the record and the deferential standard of review of the chancellor's findings that is applicable here, we find no error in the chancery court's August 12, 2020 order finding that "Taylor . . . failed to rebut the presumption of destruction" and setting aside and dismissing its prior order allowing probate of a copy of Markwell's will. The chancery court's August 12, 2020 order certified as a final judgment pursuant to Rule 54(b) is affirmed.

¶41.    **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**