# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CA-01229-SCT

*IN THE MATTER OF THE ADMINISTRATION*
*OF THE ESTATE OF NORMA ALLENE CLOUD*
*CROWELL, DECEASED: CARON D. CROWELL*

*v.*

*THE ESTATE OF JACKIE CROWELL TROTTER,*
*DECEASED: BY ALAN TROTTER,*
*ADMINISTRATOR*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/07/2012 |
| TRIAL JUDGE: | HON. WILLIAM JOSEPH LUTZ |
| TRIAL COURT ATTORNEYS: | WALLY S. STUCKEY, JR. |
| | W. WEBB FRANKLIN |
| | JAMES L. MARTIN |
| | JOHN COX |
| COURT FROM WHICH APPEALED: | SUNFLOWER COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JAMES L. MARTIN |
| ATTORNEYS FOR APPELLEE: | W. S. STUCKEY, JR. |
| | WEBB FRANKLIN |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART AND REMANDED - 11/06/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., LAMAR AND KITCHENS, JJ.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     This case involves a familial dispute between two sisters.  Jackie charged her sister

Caron with unduly influencing their mother to obtain a greater share of the family property.

We affirm in part, reverse in part, and remand this case to the Chancery Court of Sunflower County.

**FACTS**

¶2.     Allene Crowell ("Allene") died testate on October 4, 2006, survived by her two daughters, Caron Crowell (Caron) and Jacqueline Trotter ("Jackie"), both of whom were named co-executrixes of Allene's estate, per Allene's will. Jackie filed a complaint alleging that Caron had unduly influenced Allene and converted assets into Caron's name, diminishing Jackie's inheritance.

¶3.     Jackie was married to Alan Trotter and lived in North Carolina until her death on April 22, 2010.[1]  Caron practiced law in New Orleans, Louisiana until 1996, at which time Caron quit working. After Caron quit working in December of 1996, she spent the majority of the next four years either traveling the world or living with Allene in Ruleville, Mississippi. While home, Caron helped her mother with personal and business affairs. Specifically, in 1997, Allene sought Caron's aid in completing a sale of timber existing on one of Allene's properties. After meeting with Louis Jackson, CPA, to discuss the timber sale and her tax return, Allene gifted the proceeds of the $180,000 sale equally to Caron and Jackie.  Caron returned every year to meet with Jackson about her mother's taxes.  Caron also started using Jackson for her own tax returns starting in 1998.

---

[1]Jackie's estate was substituted as the party plaintiff after her death. Alan was appointed as co-executor in the place of Jackie.

2

¶4.    Starting in 2000, Caron spent considerably more time with Allene in Ruleville, living with her for about six months in both 2000 and 2001. It was during this time period in September 2000 that Allene transferred four bank certificates of deposit (CDs) totaling $237,985.16 to Caron. She went with her mother to each bank and was in the room with Allene when she signed over the CDs. Caron testified that, at each bank, bank representatives[2] suggested that Allene sign the CDs over to Caron.

¶5.    In between the transfer of the four CDs, Caron advised her mother to execute a Power of Attorney (POA), authorizing Caron to act for her. Caron arranged the meeting with an attorney to draft the POA, but Allene drove. Caron testified that Allene continued to manage her own business affairs, sign her own checks, and drive herself around in 2000 and 2001. In 2000, Allene's doctor found her competent to handle her own business affairs. Caron described Allene's mental health in 2001 as "lucid and strong," with occasional forgetfulness. Caron left Ruleville in October 2001 and traveled to France, but she returned permanently in December 2001, at her mother's request.

¶6.    In January 2002, Allene was diagnosed with moderate dementia, and the doctor found that she was no longer able to handle her business affairs. After Allene's health deteriorated, and she became more forgetful, Caron testified that she started signing all of Allene's checks in 2002 under her POA. Using her POA, Caron gifted $360,000 to herself in 2002 for "Asset Protection Control."  She testified that this was done upon the advice of Jackson. In 2003,

_____

[2]Caron could not provide the identities of any specific persons who recommended changing the ownership of the CDs.

3

Caron executed a more "fulsome" Power of Attorney, as Allene had been diagnosed with Alzheimer's disease. A few months later, Caron placed Allene in the first of several nursing homes.

¶7. After Allene's death, Allene's will was admitted to probate, and Jackie and Caron were made co-executrixes, per Allene's will. Caron was ordered to provide an accounting and inventory of estate property, and the trial judge authorized living expenses in the amount of $5,000 a month for Caron, who was to perform the majority of the duties of executrix.

¶8. Thereafter, Caron filed a motion to compel the estate to pay her the monthly living expenses, having received only $30,000 in more than thirteen months. Jackie responded that Caron was not entitled to receive the living expenses, as she had wrongfully converted estate assets, refused to relinquish estate property, and refused to provide an accounting as ordered by the court. The trial court "rescinded and held for naught *nunc pro tunc*" the portion of the previous order authorizing Caron to receive living expenses. The order also required Caron within twenty days to complete an inventory and assimilate all assets to be placed in trust, pending the outcome of the litigation, to which Caron complied.

¶9. Later, Jackie filed a complaint against Caron, alleging that she had unduly influenced Allene into gifting Caron large sums of money, amounting to a conversion of assets belonging to the estate.

¶10. At trial, the court heard testimony from Alan Trotter, Jackson, and Caron. Jackson testified that Allene's total cash assets on January 1, 2002, were $1,167,145. On May 16, 2008, the estate's total cash assets were $212,469, representing a diminution of $954,696.

4

Jackson testified that the $1.17 million figure did not include the four CDs that were gifted to Caron in September 2000. Counting those four CDs, the total cash assets would have been $1,405,129. Not counting the pre-2002 transfers, Jackson testified that Caron had transferred $727,396 from 2002 until Allene's death in 2006.

¶11.    Starting in 2002, Caron gifted $10,000-to-11,000 annually to herself every year until Allene's death.[3]  Against Jackson's advice, Caron did not provide the same gift to Jackie in 2002 and 2003.  However, Caron, on Jackson's advice, gifted Jackie $11,000 in 2004, 2005, and 2006. Jackson testified that, beginning in 2003, in addition to the annual gift Caron bestowed upon herself each year, Caron, with his support, used the power of attorney to pay herself a monthly living expense/salary for handling Allene's affairs.  Caron paid herself $44,000 in 2003, $48,000 in 2004 and 2005, and $28,000 in 2006.  Jackson testified that he advised Caron that $4,000 a month was a fair amount to pay herself for the amount of money and land she was managing.

¶12.    Caron testified that she was entitled to a reimbursement of $120,000 for expenses paid on behalf of Allene, such as insurance, property taxes on several houses, medical bills, and repairs done to the various properties.  Caron testified that she thought that Allene needed a conservatorship as far back as 2002, but that Caron could not find an attorney to assist her. She testified that, from 2001 onward, she consulted at least forty-two attorneys.  She estimated that she spent around $100,000 on legal advice.

---

[3]In 2002, the gift exclusion was only $10,000.  It rose to $11,000 starting in 2003.

¶13. The trial judge entered an opinion finding that the estate had demonstrated by clear and convincing evidence that a confidential relationship had existed between Caron and Allene since "at least 1997." Moreover, Caron failed to rebut the presumption that the *inter vivos* gifts were not valid. Specifically, the trial judge found "Caron's testimony in regard to rebutting the undue influence presumption of [the 2000] CDs to not be credible." The Court further found that "Caron did not act in good faith when transferring $727,396.00 worth of CDs into her name during the 2002 to 2008 accounting period," and must remit that amount back to the estate. However, the Court found that the "$4000.00 per month for living expenses was a just compensation," and therefore, "is not subject to repayment to Allene's estate." The Court also ordered Caron to pay $146,776 in interest on the $727,396. The Court further found that Caron was entitled to reimbursement for only $8,247.40 of the more than $28,000 submitted for reimbursement. Finally, the trial court found no evidence to justify punitive damages or attorneys' fees against Caron.

¶14. Thereafter, the trial court held a hearing to correct mathematical errors in its judgment. Jackson was called back to correct and clarify the numbers. He clarified his testimony to state that the year 2000 CDs were included in the $727,396 and the $1.17 million. Additionally, a $105,910 account was held in Caron's attorney's vault. Jackson testified that he had duplicated it in his earlier calculations because he did not know it was held by Caron's attorney. Jackson testified that the $105,910 was included in the $727,396 number. In short, Jackson clarified at the hearing that the $727,396 number was correct other than adding interest to it. Thus, Caron owed the estate $727,396. After turning over the

6

$539,000 determined to be held in trust by Caron's attorney, the difference was what Caron was to pay of her own money to restore the estate to what it should be, plus interest.

¶15.    The court entered a judgment finding that the $727,396 that must be remitted to the estate actually earned only $25,686 in interest.  As there was only $539,000 in assets currently in Caron's attorney's vault, Caron was ordered to pay the estate $214,082, minus a credit Caron was entitled to receive of $8,247.40, for a total judgment against Caron in the amount of $205,834.60.

¶16.    After Caron filed a motion for reconsideration, the trial court entered an Amended Judgment, *sua sponte* adding another $100,000 to the judgment, finding that Caron had spent in excess of $100,000 of estate assets "on more than 40 attorneys seeking a legal opinion to support her position . . . amount[ing] to a dissipation of the Estate's assets."  The Amended Judgment increased the judgment against Caron to $305,834.60.  The trial court then denied Caron's motion for reconsideration and motion for a new trial.  The trial court entered an order removing Caron as co-executrix and appointing Alan as the sole executor of Allene's estate.  It is from the $305,834.60 judgment and order removing Caron as co-executrix that Caron now appeals.

¶17.    Caron raises the following issues, verbatim:

    I.      There was no confidential relationship between Caron and her mother in January, 2000, and no undue influence.

    II.    Caron rebutted presumption of undue influence, if one did exist, by clear and convincing evidence.

III. Powers of attorney dated September 13, 2000, and June 25, 2003, are valid.

IV. The transfers pursuant to the September 13, 2000, power of attorney are proper.

V. $214,082.00 award not supported by the evidence.

VI. Determination of expenses incurred by Caron for benefit of estate deficient.

VII. Trial court's sua sponte increase of judgment not justified.

VIII. Caron wrongfully removed as co-executrix.

In cross-appeal, the estate of Jackie raises the following issues, verbatim:

I. The lower court erred in failing to award Jackie a personal judgment against Caron for converting funds payable to Jackie on her mother's death.

II. The lower court erred in not awarding a judgment against Caron for the unauthorized living expenses she paid herself from her mother's assets.

III. The lower court erred in failing to award Jackie a judgment in order to equalize the gifts Caron received from her mother for the annual exclusion gifting.[4]

IV. The lower court erred in failing to award Jackie punitive damages and attorney fees.

¶18. Because we reverse and remand on Issue VII of the direct appeal and find substantial evidence supporting the chancellor's findings on all other raised issues, we will limit our

---

[4]This issue is procedurally barred as it was never raised or ruled upon by the trial judge. *InTown Lessee Assocs., LLC v. Howard*, 67 So. 3d 711, 718 (Miss. 2011) (citing *Ill. Cent. R.R. Co. v. Byrd*, 44 So. 3d 943, 948 (Miss. 2010)).

discussion to whether the trial court erred in *sua sponte* increasing the judgment by $100,000 for Caron's estimated expenditures on attorney's fees.

## STANDARD OF REVIEW

¶19. This Court "will not disturb the factual findings of a chancellor when supported by substantial evidence unless the Court can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard." ***Barton v. Barton***, 790 So. 2d 169, 175 (Miss. 2001) (quoting ***Cummings v. Benderman***, 681 So. 2d 97, 100 (Miss. 1996)). "This is as true of ultimate facts as of evidentiary facts." ***Mullins v. Ratcliff***, 515 So. 2d 1183, 1189 (Miss. 1987). We must "examine the entire record and accept 'that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact.'" ***Mullins v. Ratcliff***, 515 So. 2d 1183, 1189 (Miss. 1987) (quoting ***Cotton v. McConnell***, 435 So. 2d 683, 685 (Miss. 1983)). "[F]inally, the trial judge, sitting in a bench trial as the trier of fact, has sole authority for determining credibility of the witnesses." ***Mullins v. Ratcliff***, 515 So. 2d 1183, 1189 (Miss. 1987).

## ANALYSIS

¶20. Caron argues that the trial court's finding that she spent $100,000 of the estate's money on attorney fees is contrary to the facts in evidence. Caron further argues that ordering her to pay $100,000 increases the value of the estate by $100,000 over the value established by Jackson.

¶21. We find that the trial court erred in *sua sponte*, post-judgment, increasing the judgment by $100,000 for Caron's estimated expenditures on attorney fees. The record is inconclusive about both the amount of money spent on attorney fees, and from whose money the funds to pay the legal fees came. The trial court noted that Caron testified that the money came from her own funds, which was the only evidence presented.

¶22. At trial, Caron testified that she had seen at least forty-two lawyers. When asked how much she had spent on legal fees, Caron testified "It's a lot." When asked if she had paid for legal fees out of her own money, Caron responded:

> A. Well, it depends – as long as Mother was alive, I think I used her funds. I didn't spend that much really. You know, I was trying to get good legal advice for her and get her totally protected. A lot of the attorneys didn't charge. But I don't know how much. I don't know how much it was. I don't think it was all that much. Then since her, I have paid my own attorneys fees, and it's been a lot. I – you know, there's – it's been a lot.
>
> Q. Well, give me an estimate.
>
> A. $100,000, I think.
>
> Q. In attorney fees?
>
> A. Yes, that's a guesstimate, estimate.

¶23. The record does not disclose substantial evidence to support a $100,000 increase in judgment. Caron "guesstimated" the attorney fees to be around $100,000. No testimony of bank statements, canceled checks, bills from attorneys, or any other form of evidence was offered to support or contest Caron's "guesstimate."

¶24. If Caron actually spent $100,000 on legal fees, the only testimony before the court was that she paid most of the fees out of her own pocket. The $100,000 "guesstimate" followed her statement that she has paid "a lot" of her "own" legal fees. After Caron testified that she had spent a lot of her own money, counsel asked Caron for an estimate. "$100,000.00, I think" was responsive to a question asking how much of her own money she had spent, which is not substantial evidence to support the trial court's finding.

¶25. Jackie's estate argues that, since Caron had been unemployed since 1996, it would have been impossible for her to have paid for legal fees with her own money. However, Caron testified that she had "about $150,000 of savings, some in an IRA." Although Caron was unemployed, she received a considerable amount for "living expenses" from 2003-2006. The amount paid as living expenses was found by the trial judge to be a reasonable fee for her constant services on behalf of Allene.

¶26. The record lacks substantial evidence supporting that Caron actually spent $100,000 of the estate's money. Caron's ambiguous and unsupported $100,000 "guesstimate" is not substantial evidence. We find such a conclusion is in error.

**CONCLUSION**

¶27. The trial court's *sua sponte* award of an additional $100,000 post-judgment, is reversed. The trial court's judgment is supported by substantial evidence on all other issues and is affirmed. Accordingly, the judgment of the Chancery Court of Sunflower County is reversed in part and affirmed in part and the case is remanded to the chancery court for entry of judgment in accordance with this opinion.

11

¶28.    **AFFIRMED IN PART; REVERSED IN PART AND REMANDED.**

**WALLER, C.J., DICKINSON, P.J., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**