# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-01535-SCT

*PAT HARRISON WATERWAY DISTRICT*

*v.*

*COUNTY OF LAMAR, POLITICAL SUBDIVISION OF THE STATE OF MISSISSIPPI; BOARD OF SUPERVISORS OF LAMAR COUNTY, JOE BOUNDS, PRESIDENT; TAX COLLECTOR OF LAMAR COUNTY, JACK SMITH, COLLECTOR*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/29/2013 |
| TRIAL JUDGE: | HON. HOLLIS MCGEHEE |
| TRIAL COURT ATTORNEYS: | NEVILLE H. BOSCHERT |
| | KAYTIE M. PICKETT |
| | JOLLY W. MATTHEWS |
| | R. DAVID KAUFMAN |
| | RICHARD CIRILLI, JR. |
| | PERRY W. PHILLIPS |
| | HAROLD E. PIZZETTA, III |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | NEVILLE H. BOSCHERT |
| | KAYTIE M. PICKETT |
| | JOLLY W. MATTHEWS |
| ATTORNEYS FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: HAROLD E. PIZZETTA, III |
| | R. DAVID KAUFMAN |
| | R. RICHARD CIRILLI, JR. |
| | PERRY W. PHILLIPS |
| NATURE OF THE CASE: | OTHER |
| DISPOSITION: | AFFIRMED - 03/19/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC**

**DICKINSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Lamar County wishes to withdraw from the Pat Harrison Waterway District ("the District"). The question presented is the amount of money Lamar County must pay to do so. The chancery court found that Lamar County owed $337,088, excluding the District's perpetual park operating and maintenance obligations as "contractual obligations . . . that are outstanding" under the statute. We affirm.

## FACTS AND PROCEDURAL HISTORY

### I.    The Pat Harrison Waterway District

¶2.    In 1962, in order to develop Mississippi's water resources, the Mississippi Legislature created the Pat Harrison Waterway District, which included Lamar and fourteen other counties within the Pascagoula River Basin.[1] Funding for the District primarily is provided by assessments of the member counties.[2]

### II.    The District's Governmental Contracts

¶3.    After it was formed, the District worked with the United States Army Corps of Engineers to develop a comprehensive development plan under which the District entered into a series of eight contracts with various departments of the federal and state governments to operate its water parks.[3]

---

[1] Miss. Code Ann. § 51-15-103 (Rev. 2003). In addition to Lamar County, the fourteen counties originally included in the District were Clarke, Covington, Forrest, George, Green, Jackson, Jasper, Jones, Lauderdale, Newton, Perry, Smith, Stone, and Wayne Counties.

[2] Miss. Code Ann. § 51-15-129 (Rev. 2003).

[3] These include: (1) the United States Department of the Interior's Land and Water Conservation Fund; (2) the United States Department of Agriculture's Natural Resources Conservation Service through programs with the Soil Conservation Service and National Watershed Protection and Flood Prevention Act Program; (3) the United States Army Corps

## A. Land and Water Conservation Fund Contracts

¶4. The District established four water parks under contracts with the United States Department of the Interior, which provided funding from its Land and Water Conservation Fund ("LWCF").[4] These contracts, under the "Project Termination" heading, provide that the federal government may seek specific enforcement of its contracts in case of a breach of performance by the State. And the District's general obligations for the "Use of Facilities" under the LWCF contracts require that:

1. The State shall not at any time convert any property acquired or developed pursuant to this agreement to other than the public outdoor recreation uses specified in the project proposal attached hereto without the prior approval of the Director.

2. The State shall operate and maintain, or cause to be operated and maintained, the property or facilities acquired or developed pursuant to this agreement in the manner and according to the standards set forth in the Manual.

¶5. Finally, the 2008 LWCF State Assistance Program Manual—referenced in the District's contracts—provides post-completion operation and maintenance obligations:

Property acquired or developed with LWCF assistance shall be operated and maintained as follows:

1. The property shall be maintained so as to appear attractive and inviting to the public.

2. Sanitation and sanitary facilities shall be maintained in accordance with applicable health standards.

---

of Engineers; and (4) the Mississippi Natural Heritage Program.

[4] Parks established under the LWCF program include: (1) Flint Creek Water Park in 1967; (2) Archusa Creek Water Park in 1969; (3) Little Black Creek Water Park in 1970; and (4) Maynor Creek Water Park in 1972.

3. Properties shall be kept reasonably open, accessible, and safe for public use. Fire prevention, lifeguard, and similar activities shall be maintained for proper public safety.

4. Buildings, roads, trails, and other structures and improvements shall be kept in reasonable repair throughout their estimated lifetime to prevent undue deterioration and to encourage public use.

5. The facility shall be kept open for public use at reasonable hours and times of the year, according to the type of area or facility.

6. A posted LWCF acknowledgment sign shall remain displayed at the project site . . . .

¶6. The LWCF Manual also provides the following escape from operation and maintenance costs when facilities become obsolete: "Project sponsors are not required to continue operation of a particular recreation area or facility beyond its useful life." According to the District's 2011 audits, the "estimated useful lives" of the District's assets are 5-30 years for buildings, 5-25 years for building improvements, 5-50 years for improvements other than buildings, 5-20 years for equipment, and 15-50 years for capital leases. Obsolescence may also arise, among other reasons, if "changing recreation needs dictate a change in the type of facilities provided," or "park operating practices dictate a change in the type of facilities required."

### B. Soil Conservation Service and National Watershed Protection and Flood Prevention Contracts

¶7. Three of the District's water parks were established with funding through the United States Department of Agriculture's Soil Conservation Service Department and the National

4

Watershed Protection and Flood Prevention Act Program.[5]  Under the Dry Creek contract,

the relevant provision provides that:

> The Dry Creek Water Management District and the Pat Harrison Waterway District agree that all land acquired on which Federal assistance is provided will not be sold or otherwise disposed of for the evaluated life of the project, except to a public agency which will continue to maintain and operate the recreational development in accordance with the operation and maintenance agreement.

¶8.     Under the Turkey Creek Soil Conservation Operations and Maintenance Agreement,

the District agreed to operate and maintain "project measures" developed through the

program and to use the real property "for the purpose for which it was acquired and in

accordance with the [Operations and Maintenance] agreement."  The District's maintenance

obligations require only that:

A.     The Sponsor will:

    1.     Be responsible for and promptly perform or have performed without cost to the Service . . . all maintenance of the structural measures determined by either the Sponsor or the Service to be needed.

    2.     Obtain prior Service approval of all plans, designs and specifications for maintenance work involving major repair.

B.     The Service will upon request of the Sponsor and to the extent that its resources will permit, provide consultative assistance in the preparation plans, designs and specifications for needed repair of the structural measures.

---

[5] Parks established through the Soil Conservation Service and National Watershed programs include: (1) Dry Creek Water Park in 1966; (2) Turkey Creek Water Park in 1967; and (3) Big Creek Water Park in 1979.  The District also received funding through this same program for the creation and operation of a flood control structure at Sowashee Creek in 1971.

¶9. Notably, the contract provides that "[a]dmission or users fees shall be charged only as necessary to produce revenues required by the Sponsor(s) to . . . provide adequate inspection, operation, maintenance, and replacement of the [project measures]." Additionally, under the National Watershed Program's 2009 Manual, "[t]he term of the [Operation and Maintenance] agreement expires when the evaluated life of the works of improvement has been met."

¶10. Finally, under the Big Creek Soil Conservation Agreement, the District agreed to "assume responsibility for operation and maintenance in accordance with the Operation and Maintenance Agreement." Like the Turkey Creek contract, the Big Creek contract also contains the same language from the National Watershed Program's 2009 Manual about the operation and maintenance agreement expiring at the end of the improvements' life span.

### C. Lease Agreement with the Army Corps of Engineers

¶11. In establishing the Okatibbee Creek Water Park, the District leased the land and water areas from the United States Army Corps of Engineers. The term of the original lease agreement was for fifty years—beginning July 1, 1968, and ending June 30, 2018. But in 1973, the District and the Army agreed to a supplemental lease agreement providing:

> This lease may be relinquished by the lessee at any time prior to tender by the Government and acceptance by the lessee of any cost-sharing payments pursuant to The Contract by giving to the Secretary of the Army, through the District Engineer, at least 30 days notice in writing. Subsequent to such tender and acceptance, this lease may be relinquished by the lessee at any time after 30 June 1999 by giving notice as provided above.

So, while the District's lease term does not expire until 2018, the District has the option to terminate the lease at any time by giving thirty days' written notice to the Army.

6

### D. Agreement with the Mississippi Wildlife Heritage Committee

¶12. Finally, the District maintains a state historic site at Dunn's Falls through a 1982 agreement with the Mississippi Wildlife Heritage Committee. As part of its agreement with the State, the District agreed to various obligations, including:

> 4. Pat Harrison Waterway District agrees to maintain with paint the property lines which have been established by the property survey . . . .
>
> 5. Pat Harrison Waterway District agrees to assign an employee to live on the Dunn's Falls property and shall be responsible for any salary or other expenses which might result from this employment.
>
> 6. Pat Harrison Waterway District agrees to enforce the rules and regulations adopted by the Pat Harrison Waterway District Board . . . .

### III. Lamar County's Withdrawal from the District and the Withdrawal Statute

¶13. On September 6, 2011, Lamar County notified the District that it was exercising its right to withdraw under Mississippi Code Section 51-15-118, which provides that "[t]he withdrawing county shall be responsible for paying its portion of any district bonds, contractual obligations, and any other indebtedness and liabilities of the district that are outstanding on the date of such county's withdrawal from the district."[6] Under the statute, the withdrawing county's obligation "shall be determined through an independent audit conducted by a certified public accountant."[7]

### IV. Litigation Between the District and Lamar County

---

[6] Miss. Code Ann. § 51-15-118 (Rev. 2003).

[7] *Id.*

7

¶14.   In January 2012, Wolfe, McDuff & Oppie, PA—the District's own certified public accounting firm—sent Lamar County an "Independent Accountant's Report" which claimed that Lamar County's portion of district bonds, contractual obligations, and other indebtedness and liabilities was $9,201,619.  Lamar County disagreed, and this litigation soon followed.

### A.   Petition for Injunction and Appointment of Independent Auditor

¶15.   The District fired the first shot in May 2012, by filing a petition in the Chancery Court of Forrest County, seeking an injunction.  Lamar County responded with a motion for partial summary judgment, claiming it did not owe the District for contractual obligations incurred after September 6, 2011.  Lamar County also requested that the court appoint an independent auditor to determine the amount it owed under Section 51-15-118.

¶16.   After all of the Forrest County Chancery Court judges recused from the case, this Court appointed the Honorable Hollis McGehee as Special Judge.  Judge McGehee promptly held a hearing and issued an order granting partial summary judgment to Lamar County. Judge McGehee rejected the Wolfe audit and ordered the parties to attempt to agree on a certified public accountant to perform an independent audit to determine Lamar County's obligation as of September 6, 2011.  Both parties later agreed on the certified public accounting firm of Tann, Brown & Russ Co., PLLC, to perform the independent audit.

### B.   Independent Audit and Fight Over Contractual Obligations

¶17.   Tann, Brown & Russ produced an "Independent Auditor's Report," a "Schedule of Lamar County's Portion of the Pat Harrison District's Bonds, Contractual Obligations, and Other Indebtedness and Liabilities," and "Notes to the Schedule of Lamar County's Portion

of Bonds, Contractual Obligations, and Other Indebtedness and Liabilities." Lamar County

filed these audit reports with the court in December 2012. The audit excluded the District's

perpetual park operating costs from the schedule of contractual obligations.

### 1. Tann, Brown & Russ's Audit

¶18. In its audit, Tann, Brown & Russ excluded the perpetual park operating costs from its

calculation of the portion of the District's contractual obligations Lamar County was

obligated to pay, explaining:

> As discussed in Note 6 to the schedule, the District has included $146,524,357
> as an estimate of the present value of the District's future costs (net of park
> user fee revenues) to operate the Okatibbee Creek Park through June 30, 2018,
> and to perpetually operate its other recreational parks. In our opinion, the
> estimated future costs to operate the Okatibbee Creek Park through June 30,
> 2018, and to perpetually operate the District's other recreational parks should
> not be included in the schedule because they are not contractual obligations of
> the District as of September 6, 2011, in accordance with Section 51-15-118 of
> the Mississippi Code.[8]

¶19. The report further explained why the perpetual park operating costs were not

contractual obligations:

> The District's lease agreement with the U.S. Corps of Engineers for the
> Okatibbee Creek Park is not a contractual obligation because it is cancelable
> by the District. In addition, while the District's agreements with the National
> Park Service and Natural Resources Conservation Service generally require
> the continued use of the District's other parks for outdoor recreational

---

[8] In Note 6 accompanying the schedule, Tann, Brown & Russ explained that it had calculated the perpetual park operating costs using the Gordon Growth Method. The Gordon Growth Method is formula used to calculate the future value of businesses and other assets based on the assumption that future revenues, expenses, and other costs will continue to grow at a constant rate. All expert accountants in this case agreed that the Gordon Growth Method was an appropriate method for calculating the District's perpetual park operating costs.

purposes, these agreements do not require a specific amount of expenditures at the parks. Furthermore, the District's agreements with the National Park Service, Natural Resources Conservation Service, and U.S. Corps of Engineers allow the District to charge park user fees to offset the park operating costs. Consequently, the amount of the District's net cost to operate the parks is within the District's control and is not a contractual obligation in accordance with Section 51-15-118 of the Mississippi Code.

¶20. After explaining its reasoning for excluding the perpetual park operating costs, the Tan, Brown & Russ audit then provided the following conclusion and calculation:

If the perpetual park operating costs of $146,524,357 were excluded from the schedule, Lamar County's portion of the Pat Harrison Waterway District's bonds, contractual obligations, and other indebtedness and liabilities as of September 6, 2011, would be decreased by $18,648,448, and Lamar County's portion of the Pat Harrison Waterway District's bonds, contractual obligations, and other indebtedness and liabilities as of September 6, 2011, in accordance with Section 51-15-118 of the Mississippi Code would be $337,088.

¶21. While Tann, Brown & Russ excluded the perpetual park operating costs as contractual obligations in the schedule, it did consider other future contractual obligations, including the District's project grant commitments described in Note 4, and the District's operating lease and service contract obligations described in Note 5. Note 4 explained that:

The District awards grants each year for various projects in its member counties. Grant awards generally cover 50% of the eligible project costs up to a maximum grant amount of $25,000. These grant commitments are payable after each project's completion based upon documentation of the costs incurred by the grant recipient.

¶22. Note 5 explained that "[t]he District has entered into certain equipment operating leases and service contracts with non-cancelable terms." Both of these future contractual obligations were included in the schedule of contractual obligations.

**2.     Accounting Standards**

10

¶23. The Tann, Brown & Russ audit did not declare the specific accounting standards it used, stating only that it "conducted [the] audit of the schedule in accordance with auditing standards generally accepted in the United States of America." Relevant to this case are two generally recognized accounting standards, either or both of which provide guidance as to what should and should not be classified as contractual obligations.

¶24. The Financial Accounting Standards provide guidance on analyzing and preparing financial statements for businesses and nonprofits. Under these generalized standards, liabilities are defined as "probable future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions or events."

¶25. By contrast, the Governmental Accounting Standards—the District's CPA used these standards when it performed the District's 2011 audit—provide guidance on analyzing and preparing the financial statements of state and local governments. These standards provide that, "[f]or an obligation to be a liability, it should be a present obligation," meaning "[t]he event that created the liability has taken place." This is distinguishable "from a commitment that may become a liability in the future when the event giving rise to the liability occurs. The government may be able to withdraw from or avoid the commitment until a future event giving rise to the liability occurs."

### C. Trial on the Independent Audit

¶26. Predictably, the District took issue with the Tann, Brown & Russ report, primarily the exclusion of perpetual park operating and maintenance costs from the schedule of contractual obligations. In January 2013, the District filed objections to the independent auditor's report,

11

objecting "to the auditor's adverse opinion," and requesting that "the [c]ourt strike that opinion and rely solely on the auditor's schedule and render judgment that the amount Lamar County owes" upon withdrawal "is $18,985,536." The District argued that Tann, Brown & Russ's refusal to characterize perpetual park operating costs as contractual obligations was a "legal opinion."

¶27. Lamar County then filed responsive pleadings and the District filed a rebuttal, including a rebuttal auditor report. In May 2013, the State of Mississippi intervened, filing a motion for leave to file an *amicus curiae* brief. Lamar County then filed a response to the District's rebuttal and the State's *amicus* brief.

¶28. On August 19 and 20, 2013, the trial court held a hearing on the District's objections. The District called four witnesses: Scott Hodges (the Tann, Brown & Russ auditor who performed the independent audit), Hiram Boone (executive director of the District), George Decoux (comptroller of the District), and Jim Koerber (the District's rebuttal auditor). In response, Lamar County called John Adler (the County's own expert accountant).

### 1.     Testimony of Scott Hodges

¶29. Hodges explained that "[t]he contracts existed, but the contracts did not require all of those expenditures. The contracts only required continued use of the parks for recreational purposes." Hodges further explained that the historical costs the District used to calculate the perpetual operating costs "were not required by those contracts. Those costs were incurred, but they were not required by the contracts." And Hodges noted that "[i]t's availability of use, not a spending of money that the [District's] contract[s] require[ ]." Hodges elaborated on the point:

If [the perpetual park operating costs are] within their control, it's not an obligation. An obligation is something that . . . an outside force is obligating you to do[,] not within your control. It's not your decision. You're obligated by contract to do it. So by definition, if it's within their control, it's not an obligation.

¶30. Hodges further explained, "[i]f an entity has a contractual obligation, it should be disclosed in the annual financial statements." The perpetual park operating costs were never included in the District's financial statements before Lamar County's withdrawal.

¶31. Finally, in explaining Tann, Brown & Russ's role in the process, Hodges testified: "[o]ur job was to determine if it was in accordance with the statute. And so, that's what we did, is determine that [the perpetual park operating costs] that [the District] included was not in accordance with the statute." Hodges reiterated that the main focus of the audit was to calculate what Lamar County owed under Section 51-15-118, which was paramount in his mind to either Financial Accounting Standards Board or Governmental Accounting Standards Board standards.

### 2. Testimony of Hiram Boone

¶32. Hiram Boone, the executive director of the District, testified about the District's value to the state and its obligations. Boone emphasized that the District did more than manage parks and that the District's responsibilities included periodically inspecting dams and other flood-control structures. Boone said these obligations required continued support from the counties in the District. Boone also noted that the water parks throughout the District spurred regional economic growth and development.

¶33. However, during cross-examination, Boone conceded that the District's obligations under the contracts were quite amorphous:

13

Q. None of the contracts that Pat Harrison Waterway District has with the federal government tells the Pat Harrison Waterway District how it has to operate the facilities, does it?

A. Yes. We have certain responsibilities to the LCWF to operate those structures.

Q. All it [says] you have to do is use them for outdoor public recreation, correct?

A. That is part of it. When they were built, it was intended for flood control, erosion control, flood protection downstream as a water supply. They could be used for drinking water, industrial or irrigation purposes. So those structures are operated for multiple use besides recreation. Recreation is one of the side benefits.

Q. I understand that. But with respect to the contracts that the LWCF applied to.

A. Yeah.

Q. All they say is you need to operate them as outdoor public recreation . . . [f]acilities, correct?

A. Yes.

Q. Okay. They don't tell you how much money you have to spend on them, do they?

A. No. But they—when you say properly maintained, it takes whatever it does.

¶34. Further, Lamar County cross-examined Boone about the District's low park entrance rates compared to other Mississippi state parks. For example, the District charged $30 per person for an annual individual entrance pass to its parks, whereas the State of Mississippi charged $42 for the same pass. The District also greatly undercut the State when it came to annual boat-launch passes: $102 at a state park compared to just $65 at the District's water parks.

### 3. Testimony of George DeCoux

¶35. George DeCoux, the District's comptroller, testified that the Tann, Brown & Russ auditors had never asked him if the District could increase park user fees to balance its budget and perpetually maintain its parks. During cross-examination, DeCoux also

14

confirmed that "on most things other than camping and cabins," the District's park user fees were less than State park user fees.

### 4. Testimony of Jim Koerber

¶36. Finally, the District called Jim Koerber, the District's own certified public accountant and expert. Koerber had "no problems" with the numbers in Tann, Brown & Russ's audit, but he disagreed with Tann, Brown & Russ's exclusion of perpetual park operating costs as contractual obligations, because he believed that decision was a legal conclusion outside the purview of a Certified Public Accountant. He testified that "[t]here [wa]s no accounting basis to exclude those contractual obligations."

¶37. Koerber also testified that he primarily relied on Financial Accounting Standards concepts to classify the perpetual park operating costs as contractual obligations, and that he looked to Governmental Accounting Board standards when he classified perpetual park operating costs as contractual obligations, finding that those standards also justified his classification. However, Koerber conceded that there was no real difference between the two standards.

¶38. On cross-examination, the District challenged Koerber's stance on including the perpetual park operating costs as future contractual obligations:

> Q. My question was, if you went to the Pat Harrison Waterway District on September 6, 2011 and asked for contracts that had these numbers that would be owed, due and payable at some point in the future, there is no contract that contains those numbers.
> A. Oh. That's correct . . . .
> Q. I'm just trying to establish that unlike with contractual obligations and the figures that are there, there are no supporting contracts you could go lay your hands [on] and say ["]here are the amounts that are due and payable under those contracts.["]

15

A.      No, sir, it would not be specified in the contracts . . . [,][b]ut I do want to be clear [ ] that . . . there would be a cost to operate those contracts.

¶39.    After Koerber testified, the District rested.

### 5.      Testimony of John Adler

¶40.    Lamar County then called John Adler, the County's own CPA and expert, who testified that Tann, Brown & Russ conducted the audit in accordance with generally accepted professional auditing standards and accounting principles. Alder unequivocally stated that Governmental Accounting Standards Board principles should be used in determining whether the perpetual park operating costs were contractual obligations.

¶41.    Alder disagreed with Koerber and agreed with Tann, Brown & Russ's exclusion of the perpetual park operating costs as contractual obligations, because "there [wa]s no contractual obligation that they spend money."

### D.      Trial Court's Ruling Excluding Perpetual Park Operating Costs from the Schedule of Contractual Obligations

¶42.    When the hearing concluded, Judge McGehee took the matter under advisement and later issued his ruling, adopting the Tann, Brown & Russ audit's schedule of liabilities. Judge McGehee found that Lamar County withdrew from the district on September 6, 2011, and that an independent auditor had determined that Lamar County's portion of "contractual obligations . . . that [we]re outstanding on the date of [the] [C]ounty's withdrawal" was $337,088.

¶43.    Judge McGehee also found "that under the provisions of Section 51-15-118, Lamar County [wa]s not responsible or liable for perpetual park operating costs," and "that

16

perpetual park operating costs are not provided for in Section 51-15-118." The trial court

supported its finding with the following reasons:

(a)     Section 51-15-118 does not specify perpetual operating costs as an obligation;

(b)     Section 51-15-118 provides that the county is responsible for those "that are outstanding on the date of such county's withdrawal from the District," and there were no such perpetual operating costs outstanding on September 6, 2011;

(c)     Section 51-15-118 provides that the determination shall be by an independent audit and that has been done and accomplished in accordance with the statute and by agreement of the parties;

(d)     Section 51-15-118 provides that the determination should be made by a certified public accountant. The legislature, by this provision, indicated its clear intent that accounting standards would be applied in making the determination. The applicable accounting standards in this case are promulgated by the Governmental Accounting Standards Board ("GASB"). GASB standards, which were introduced . . . during the hearing, do not support a finding that the perpetual park operating costs fall within the specified obligations of the withdrawing county;

(e)     [T]he District's own financial records, its own prior audits, do not include the claimed perpetual park operating costs as a liability of the District;

(f)     [T]he contracts that the District has with the federal government . . . do not require the level of activity that the District has assumed and there is no obligation upon the District consistent with the position it takes and thus there is no contractual obligation, liability[,] or indebtedness relative thereto which can be imposed, in proportionate part, upon the withdrawing county;

(g)     [T]he contracts that the District contend give rise to its claim for perpetual park operating costs do not constitute contractual obligations or liabilities under GASB standards which, under the statutory scheme as specified in Section 51-15-118, must control;

17

(h)     [E]ven if GASB does not control, the District's position is not supported by any evidence other than its own claim which is clearly contradicted by its own records;

(i)     [A]s a footnote, the [c]ourt cannot conceive that the legislature intended that a withdrawing county would be responsible for operating costs in perpetuity because: (a) it would be contrary to the whole concept of withdrawing—why withdraw? (b) it specifically stated that the measuring date is the date of withdrawal.

¶44.     After Judge McGehee issued his thorough and well-reasoned ruling, the District appealed to this Court.

## ANALYSIS

¶45.     The District raises two interrelated issues on appeal, first, whether the District's contracts with the federal government—requiring perpetual park operations and maintenance—constitute contractual obligations under Section 51-15-118. Its second issue concerns whether, in order to withdraw, Lamar County must pay $18,985,536, as it claims; or $337,088, as found by the chancellor.

¶46.     The State as *amicus curiae* argues that both the purpose and broad language in Section 51-15-118 require Lamar County to pay its portion of perpetual obligations under the federal contracts.

¶47.     When we review a trial court's interpretation of a statute—which is a question of law—we conduct a *de novo* review.[9] And while we give deference to a state agency's interpretation of a governing statute—like the District's argument that its duties under the

---

[9] ***Tellus Operating Grp., LLC v. Tex. Petroleum Inv. Co.***, 105 So. 3d 274, 278 (Miss. 2012) (citing ***Laurel Ford Lincoln-Mercury, Inc. v. Blakeney***, 81 So. 3d 1123, 1125 (Miss. 2012)) ("Questions of law, such as statutory interpretation, are subject to a *de novo* standard of review.").

18

federal contracts are contractual obligations under Section 51-15-118—we will not defer when that interpretation "is so plainly erroneous or so inconsistent with either the underlying regulation or statute as to be arbitrary, capricious, or contrary to the unambiguous language or best reading of a statute."[10]

¶48.    Before we engage in statutory interpretation, we look to the statute to determine whether interpretation is necessary, that is, whether the language is plain, unambiguous, and in need of no interpretation.[11]  If so, we need go no further.[12]

> **I.    The District's duties to operate and maintain its water parks and other improvements are not contractual obligations under Section 51-15-118.**

¶49.    We begin by noting Section 51-15-118's express provision that the board of supervisors of any county in the District "may elect to withdraw."[13]  And when a county elects to withdraw, it "shall be responsible for paying its portion of any district bonds, *contractual obligations*, and any other indebtedness and liabilities of the district that are outstanding on the date of such county's withdrawal from the district."[14]  And this amount

---

[10] ***Miss. State & School Emps.' Life & Health Plan v. KCC, Inc.***, 108 So. 3d 932, 939 (Miss. 2013) (citing ***Diamond Grove Ctr., LLC v. Miss. State Dep't of Health***, 98 So. 3d 1068, 1071 (Miss. 2012)).

[11] ***Miss. Methodist Hosp. & Rehab. Ctr., Inc. v. Miss. Div. of Medicaid***, 21 So. 3d 600, 607 (Miss. 2009) (citing ***In re Guardianship of Duckett***, 991 So. 2d 1165, 1181 (Miss. 2008)) ("This Court will not engage in statutory interpretation if a statute is plain and unambiguous.").

[12] ***Miss. Methodist Hosp. & Rehab. Ctr., Inc.***, 21 So. 3d at 607.

[13] Miss. Code Ann. § 51-15-118.

[14] *Id.*

19

"shall be determined through an independent audit conducted by a certified public accountant."[15]

¶50.    We think the term "contractual obligations . . . that are outstanding" as used in the statute is plain and unambiguous. Contractual obligations that may, or may not, arise in the future are not—in any sense of the word—"outstanding" obligations; they are contingent obligations that may, or may not, become outstanding in the future. They certainly are not outstanding on the date of the county's withdrawal from the district. Any interpretation to the contrary would not, as the dissent posits, be a "liberal" interpretation, but rather a stark departure from, and rejection of, the requirements of the statutory language.

¶51.    The withdrawing county is required to pay for no more than the contractual obligations that are "outstanding," that is, that are definitely owed, as of the date of its withdrawal. Our view is further buttressed by the fact that the term "contractual obligations" is sandwiched between "district bonds" and "other indebtedness and liabilities," both of which clearly speak to sums that are certain and outstanding.

¶52.    The District would have us find that "contractual obligations . . . that are outstanding" include future obligations. We find nothing in the statute that obligates a county, after withdrawal, to pay the District's future maintenance and operational obligations that have not been incurred and are not outstanding on the date of withdrawal. Nor do we find anything in Lamar County's contracts that obligates it to do so. Those future costs have not been incurred, nor are they "outstanding," and their amount is highly speculative.

---

[15] *Id.*

¶53. It seems obvious to us—but not so obvious to the dissent—that the statute requires us to examine the contracts to determine whether the District's contracts constitute *outstanding* contractual obligations. The Legislature easily could have made a withdrawing county obligated for all contractual obligations, including those that are contingent on future events. But it did not. Instead, the Legislature employed a precise modifier to the phrase "contractual obligations." Rather than make the withdrawing county liable for all contractual obligations, the statute limits that liability to contractual obligations that are "outstanding."

¶54. As the contracts show, the duty to share in future maintenance and operational costs rests on those counties that remain within the District when the costs are incurred. The District's future operations and maintenance costs were not presently due and owing when Lamar County withdrew and the District has discretion in how these duties and obligations will be fulfilled in the future.

¶55. As the federal contracts plainly provide—and as the independent auditor noted—there is no requirement that the District spend certain amounts every year maintaining the parks. Nor is there anything inhibiting the District from increasing its entrance fees or outsourcing its operation and maintenance responsibilities to third parties in the future to offset these costs.

¶56. Moreover, many of the District's federal contracts do not require maintenance and operation of the structures beyond their estimated life expectancy. Many of the structures—by the District's own numbers—are at or nearing obsolescence. When these structures are retired, the District need only keep its properties open for public outdoor recreational use to remain in compliance with its contractual duties. So, these contractual

21

obligations are not chargeable to Lamar County, as the future sums were not outstanding when Lamar County withdrew.

¶57.    The meaning of "contractual obligations . . . that are outstanding" in the statute also excludes the District's future lease payments to the Army Corps of Engineers.  The lease is terminable by the District at any time with thirty days' written notice.  The lease agreement provides the District the option to renew the lease every month until 2018.  So a month-to-month lease, with the option to renew for a definite period of time, must be excluded as a "contractual obligation . . . then outstanding" under the statute because future lease payments were not definitely required after September 2011.[16]  The District was free to cancel its lease any time after Lamar County withdrew by giving thirty days' written notice.

¶58.    We also disagree with the District's characterization of Tann, Brown & Russ's audit as providing a legal opinion as to the meaning of the term "contractual obligations . . . that are outstanding" in the withdrawal statute.  It is true that the Mississippi judiciary has the exclusive authority to interpret the statutes of this state.[17]  But Tann, Brown & Russ's exclusion of the perpetual operations and maintenance costs from "contractual obligations . . . that are outstanding" under Section 51-15-118 was an accounting decision required by

---

[16] *See **Wilson v. Wood***, 84 Miss. 728, 36 So. 609, 609 (1904) (citing ***Usher v. Moss***, 50 Miss. 208 (1874)) ("Where the letting is 'by the month,' to continue for an indefinite period, according to the wishes of the contracting parties, the tenancy can only be terminated at the end of the monthly term then pending, upon notice duly given.  This is the evident intent of the law.").

[17] ***Miss. Ins. Guar. Ass'n v. Cole ex rel. Dillon***, 954 So. 2d 407, 412 (Miss. 2007) (citing ***Miss. Dep't of Transp. v. Allred***, 928 So. 2d 152, 156 (Miss. 2006)) ("It is our duty to interpret the statutes enacted by the Legislature, and to neither broaden nor restrict the legislative act.").

22

the statute. Indeed, the statute requires in plain and unambiguous language that the amount a county owes "shall be determined through an independent audit conducted by a certified public accountant."[18] And while it is true that differing opinions were submitted to the chancellor, the credibility and evidentiary value of expert opinions is a matter left squarely with the fact-finder.[19]

¶59. The District argues that if we follow a Texas Court of Appeals decision, we will classify the District's duties to perpetually operate and maintain its parks and structures as contractual obligations.[20] Given the clear, unambiguous meaning of the statute's phrase "outstanding contractual obligations," we need not resort to another state's law. But even were we to do so, we think the Texas case supports, rather than contradicts, our decision today.

¶60. In *City of Pflugerville*, the City already had withdrawn from Capital Metro (a regional transit authority) and was contesting whether certain multiyear contracts were legally binding and enforceable.[21] The City argued that Capital Metro's multiyear contracts were not "not legally binding contractual obligations" because the contracts contained clauses providing

---

[18] Miss. Code Ann. § 51-15-118.

[19] *See* **Univ. Med. Ctr. v. Martin**, 994 So. 2d 740, 748 (Miss. 2008) (citing **Scott Addison Constr., Inc. v. Lauderdale Cnty. Sch. Sys.**, 789 So. 2d 771, 773 (Miss. 2001)) ("Regardless of what this Court might have decided had it been sitting as the fact[-]finder, the trial court's findings must not be disturbed merely for adopting the testimony of one party's expert while disregarding that of the other party's experts.").

[20] **City of Pflugerville v. Capital Metro. Transp. Auth.**, 123 S.W.3d 106 (Tex. Ct. App. 2003).

[21] *Id.* at 108.

that future "'funding by Capital Metro is subject to appropriation of funds in the annual budget.'"[22] The City further agreed that "contracts with such language [wer]e illusory or merely provide[d] Capital Metro the option to perform."[23] Capital Metro countered that such clauses were required in all governmental contracts and that such clauses appeared in virtually all of Capital Metro's contracts.[24]

¶61.   The Texas court rejected the City's argument and found that the contracts were indeed enforceable.[25]   Key to the court's ruling was its finding that the "subject-to-appropriation" clauses "neither g[ave] Capital Metro the unbridled *discretion* to perform nor render[ed] the contracts illusory."[26]   After finding that the contracts were legally binding, the court then considered whether multiyear contracts fell within the ambit of "contractual obligations" under the broad and comprehensive Texas withdrawal statute.[27]   The Texas court found that

---

[22] *Id.*

[23] *Id.* at 108-110.

[24] *Id.* at 110.

[25] *Id.*

[26] *Id.* (emphasis added).

[27] *Id.* at 111.  Texas Transportation Code Section 451.611(b), the relevant statutory provision, provided:

(b)    An authority's outstanding obligations under Subsection (A)(1)(A) is the sum of:

(1)    the obligations of the authority authorized in the budget of, and contracted for by, the authority;
(2)    outstanding contractual obligations for capital or other expenditures, including expenditures for a subsequent year, the payment of which is not made or provided for

"[i]n the context of the statute, the phrase 'contractual obligations' is reasonably interpreted to mean any obligation undertaken by a transit authority in the form of a contract."[28] So "[t]he phrase 'contractual obligations' . . . includes obligations undertaken by a transit authority arising under multi-year contracts that are subject to appropriation of funds in the budget of a transit authority."[29]

¶62. First, we note that the contracts at issue in *Pflugerville* and the District's contracts are vastly different. While Capital Metro's contracts gave it little discretion in how it performed, the District's contracts provided limitless discretion. The LWCF and Soil Conservation contracts simply require that the water parks and structures be properly operated and maintained and remain open to public use. And the lease agreement with the Army is terminable at any time. We, like the Texas court, are unwilling to find the District's contracts

---

|     | from the proceeds of notes, bonds, or other obligations; |
| (3) | payments due or to become due in a subsequent year on notes, bonds, or other securities or obligations for debt issued by the authority; |
| (4) | the amount required by the authority to be reserved for all years to comply with financial covenants made with lenders, note or bond holders, or other creditors or contractors; and |
| (5) | the amount necessary for the full and timely payment of the obligations of the authority, to avoid a default or impairment of those obligations, including contingent liabilities. |

*City of Pflugerville*, 123 S.W.3d at 111 (citing Tex. Transp. Code Ann. § 451.611(b) (West 1999)).

[28] *City of Pflugerville*, 123 S.W.3d at 111.

[29] *Id.* at 113.

unenforceable, but we note the wide discretion the District's contracts provide in performing the operations and maintenance obligations.

¶63. Second, the future contracts that Pflugerville wanted excluded are the same type of future contracts that Tann, Brown & Russ classified as contractual obligations in its independent audit. Tann, Brown & Russ included in the schedule of contractual obligations the District's future project grant commitments and some operating lease and service contract obligations. These definite contracts, like Capital Metro's contracts, leave little discretion in how performance is rendered and are currently outstanding.

¶64. Finally, and most importantly, we note a glaring difference in the Texas withdrawal statute and Section 51-15-118. Our statute speaks in terms of contractual obligations that are "outstanding" when a county withdraws. The broad Texas statute includes as contractual obligations "capital or other expenditures" for future years and any other amount needed to prevent the transit authority from defaulting on its obligations. The Texas withdrawal statute does not limit "contractual obligations" to outstanding obligations due on the date of withdrawal.

¶65. We make the same observation Judge McGehee astutely made in his ruling: if a withdrawing county must pay to perpetually operate and maintain the District's water parks and other structures, why would the Legislature have created a withdrawal statute in the first place?[30]

---

[30] *See* **Miss. Bar v. Pierce**, 84 So. 3d 21, 24 n.11 (Miss. 2011) (Dickinson, J., dissenting) (likening the Mississippi Bar's rule prohibiting members from resigning to the fictional Hotel California, which allowed guests to check out at any time but would never let them leave).

26

¶66.    In short, the term "contractual obligations . . . that are outstanding" under Section 51-15-118 do not encompass future obligations that are not outstanding, including the District's perpetual maintenance and operation duties.  We find that Lamar County is not responsible for paying these perpetual costs before it may exercise its right to withdraw.  And because the meaning of "contractual obligations . . . that are outstanding" is plain and unambiguous under our statute, no further interpretation is needed.[31]

¶67.    We must reject the dissent's suggestion that the statute is ambiguous, and that Section 51-15-101 mandates his interpretation.  The dissent's logic essentially boils down to this:  Because (1) the ambiguous statute must be construed to support the District's purposes, which are to continue to maintain and operate the waterway, and (2) the District's viability depends on financial support of the counties, it necessarily follows that the withdrawal statute must be interpreted to keep counties in the District by imposing the highest hurdles to withdrawal.  This logic is based on the flawed assumption that the District's viability, its ability to fulfill its purpose, will be weakened if a county withdraws.

¶68.    First, under the contracts in place, the dissent cannot say that Lamar County's withdrawal will deprive the District of resources.  The financial burden for operating the District, ultimately, is upon the State of Mississippi.  So, if the remaining counties are unable or unwilling to continue those obligations in the future, the State has the responsibility for compliance with its contracts.  And, as discussed above, the District exercises expansive

---

[31] *See, e.g.*, **Diamond Grove Ctr., LLC**, 98 So. 3d at 1072 (citing **Miss. Methodist Hosp. & Rehab. Ctr., Inc.**, 21 So. 3d at 607) ("[W]hen a statute is plain and unambiguous, and conveys a clear and definite meaning, there is no occasion to resort to rules of statutory interpretation.").

authority to opt out of maintaining many facilities after they reach their life expectancy, which many already have done, obviating many of the costs in question.

¶69. So Lamar County's withdrawal will not threaten the District's purposes, it will simply shift the burden of paying to achieve those purposes to the other counties and/or the State of Mississippi. The dissent partially acknowledges as much by saying: "Should today's result lead to a mass exodus, woe to the last county standing that would alone bear the contractual obligations the majority holds do not exist." The dissent fails to point out that the "last county standing" has the option to opt out and shift the burden to the State of Mississippi, which entered the contracts with the federal government to begin with. Rather than accomplishing Section 51-15-101's dictate that the statutes be construed to best serve the District's purposes, the dissent's interpretation imposes its view as to who should bear those costs.

## II. The chancellor did not err when he found that Lamar County owed $337,088 under Section 51-15-118.

¶70. Having found that the District's perpetual park operating costs are not properly classified as contractual obligations under the statute, we next address whether the chancellor erred in finding that Lamar County owed $337,088 to withdraw. We give deference to a chancellor's factual findings when supported by substantial evidence, and we will not overturn those findings on appeal "unless the Court can say with reasonable certainly that the chancellor abused his discretion, was manifestly wrong, clearly erroneous[,] or applied an

28

erroneous legal standard."[32] In a bench trial, the trial judge has the "sole authority" to determine the credibility of witnesses and evaluate their testimony.[33]

¶71. Since Judge McGehee applied the correct legal standard, we cannot say from the evidence presented that his finding that Lamar County owed $337,088 to withdraw under Section 51-15-118 was not supported by substantial evidence and was an abuse of discretion, manifestly wrong, or clearly erroneous.

¶72. As we noted in great detail above, we fully agree that the District's operation and maintenance obligations under the LWCF, Soil Conservation, and State Heritage contracts were properly excluded as contractual obligations. We also agree that the District's lease agreement with the Army Corps of Engineers was properly excluded as a contractual obligation because the District was not required to continue the lease agreement after Lamar County's withdrawal, and any future lease payments were not presently due and owing on the date Lamar County withdrew.

¶73. So we affirm the chancellor's finding that Lamar County owes $337,088 under the withdrawal statute.

**CONCLUSION**

¶74. The judgment of the chancery court is affirmed. The District's duties to perpetually operate and maintain its parks under its federal contracts are not "contractual obligations . . . that are outstanding" under Section 51-15-118. And Lamar County's obligation to

---

[32] *Estate of Crowell v. Estate of Trotter*, 151 So. 3d 194, 198 (Miss. 2014) (quoting *Barton v. Barton*, 790 So. 2d 169, 175 (Miss. 2001)).

[33] *Univ. of Miss. Med. Ctr. v. Pounders*, 970 So. 2d 141, 146 (Miss. 2007) (citing *Pride Oil Co. v. Tommy Brooks Oil Co.*, 761 So. 2d 187, 193 (Miss. 2000)).

complete its September 6, 2011, withdrawal from the Pat Harrison Waterway District is $337,088.

¶75.   **AFFIRMED**.

**WALLER, C.J., RANDOLPH, P.J., LAMAR AND KING, JJ., CONCUR. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, CHANDLER AND PIERCE, JJ.**

**COLEMAN, JUSTICE, DISSENTING:**

¶76.   I dissent because, in my opinion, the majority's holding ignores a directive from the Legislature – which it has every right to enact and every right to expect the courts of the state to follow – that mandates that the act creating the Pat Harrison Waterway District be liberally construed to effect the purposes for which it was passed, including the preservation of the District. *See 5K Farms, Inc. v. Miss. Dep't of Revenue*, 94 So. 3d 221, 227 (¶ 21) (Miss. 2012) ("[T]he courts are without the right to substitute their judgment for that of the Legislature as to the wisdom and policy of the act and must enforce it, unless it appears beyond all reasonable doubt to violate the Constitution.") (quoting *Pathfinder Coach Div. of Superior Coach Corp. v. Cottrell*, 216 Miss. 358, 362, 62 So. 2d 383, 385 (1953)).  As more fully discussed below, the Legislature directed in the clearest possible terms that the creation of the Pat Harrison Waterway District was "*necessary and essential*" to the general welfare of the entire state.  Miss. Code Ann. § 51-15-101 (Rev. 2003) (emphasis added).

¶77.   When faced with such clear language from that branch of government whose prerogative is to set public policy for the state, I believe the Court should realize that the Legislature severely limited, if not rendered nonexistent, the Court's power to interject its own opinion regarding what interpretation of the statute in question constitutes better public

30

policy.  ***Dialysis Solutions, LLC v. Miss. State Dep't of Health***, 96 So. 3d 713, 716 (¶ 7) (Miss. 2012); Miss. Const. art. 1, § 2 (no member or group of members of one branch of government may exercise powers belonging to another branch); *see also **Nat'l Fed'n of Indep. Bus. v. Sebelius***,132 S. Ct. 2566 (2012) (Justices and judges "possess neither the expertise nor the prerogative to make policy judgments.").

¶78.    The majority's opinion commits two fatal errors.  First, the majority engrafts upon the statute its own meaning by concluding that the meaning of "contractual obligations . . . that are outstanding" is "contractual obligations . . . *owed as of the date of its withdrawal*." (Maj. Op. 51) (emphasis added).  It then equates "owed" – and therefore the word outstanding – as an amount previously incurred, and not speculative.  In essence, the majority concludes Lamar County is obligated to pay only on contractual obligations that it *previously incurred*, rather than obligations that are *outstanding*.  In light of the Section 51-15-101 mandate regarding the necessity of the District and the manner in which the act must be interpreted, I question whether such a result can jibe with the controlling statutes.  It is certainly a result that lends ease to the departure of any county from the district and greatly increases the chance that the district would cease to exist due to withdrawal of all member counties.

¶79.    Second, the majority declared Section 51-15-118 to be plain and unambiguous – having a clear and definite meaning. Therefore, they "need go no further," yet they do. (Maj. Op. ¶ 48).  When a statute is plain and unambiguous, the Court has stated that "the *Legislature shall be deemed to have intended* to mean what they have plainly expressed, and, consequently, no room is left for construction in the application of such a law." ***Conway***, 173 So. 2d at 415 (emphasis added) (citing ***Wilson v. Yazoo & M.V.R. Co.***, 6 So. 2d 313 (1942)).

31

Thus, the majority's opinion need not ruminate at such length upon distinguishing our statute from a Texas statute, considering the subject matter of the statute (i.e., the contracts), and considering the purposes and objectives of the statute. The majority engages in a pseudo-statutory interpretation, by picking and choosing the interpretations that allow it to reach its policy-driven conclusion.

¶80. I am of the opinion – and the majority's pseudo-statutory interpretation inherently supports my opinion – that Section 51-15-118 is not plain and unambiguous. In determining whether a statute is ambiguous or unambiguous, the Court looks to the words of the statute. *Miss. Dep't of Revenue v. Miss. Power Co.*, 144 So. 3d 155, 160 (Miss. 2014). In the instant case, the parties disagree on the meaning of outstanding as used in the statute. The District contends outstanding refers to a party's duties under the life of a contract. The duties may be duties performed in the past, present, or future; and they may not always be easily quantified. Lamar County contends outstanding refers to a specific and known – albeit unpaid – amount of money under a contract. It states that the federal contracts do not "require the District to expend any specific monetary amount in maintaining and operating the properties." It argues that "Lamar County has no obligation to pay speculative future operating costs of the District." As a result, Lamar County's definition of outstanding results in an easily quantified amount owed, which is consistent with the result below.

¶81. The majority fails to directly address the confusion over the correct interpretation of outstanding. It first states that "contractual obligations . . . that are outstanding" means "contractual obligations owed as of the date of [a county's] withdrawal" and does not apply to "future maintenance and operational obligations." (Maj. Op. ¶ 51-52). Thus, it concludes

32

that future obligations are not contractual obligations. It then turns its analysis to the speculative nature of the future obligations. Even though it claims the statute is unambiguous, it goes so far as to distinguish the instant case from *City of Pflugerville v. Capital Metropolitan Transportation Authority*, 123 S.W.3d 106 (Tex. Ct. App. 2003), by concluding that the District's contracts provide "limitless discretion," unlike the contracts at issue in *Pflugerville*. In essence, the majority adopts Lamar County's argument that the future obligations must be knowable at the time of departure from the district. However, the majority takes Lamar County's argument a step further by concluding that the obligations imposed by the contracts constitute contractual duties that are rendered a legal nullity by the district's discretion in fulfilling the duties.

¶82. Where a statute garners three – or at least two-and-a-half – different possible interpretations, I think it an unprecedented leap to deem the statute clear, plain, and unambiguous. I would hold Section 51-15-118 to be ambiguous and subject to thorough statutory interpretation.

> The primary rule of construction is to ascertain the intent of the legislature from the statute as a whole and from the language used therein. Where the statute is plain and unambiguous there is no room for construction, but where it is ambiguous the court, in determining the legislative intent, may look not only to the language used but also to its historical background, its subject matter, and the purposes and objects to be accomplished.

*Bailey v. Al Mefty*, 807 So. 2d 1203, 1206 (Miss. 2001) (quoting *Clark v. State ex rel. Miss. State Med. Ass'n*, 381 So. 2d 1046, 1048 (Miss.1980)). Further, the Court has stated that "legislative intent must be determined from the total language of the act and not from one section thereof considered apart from the remainder." *Lee v. Alexander*, 607 So. 2d 30,

36 (Miss. 1992) (citing ***Pearl River Valley Water Supply Dist. et al. v. Hinds Cnty., et al.***, 445 So. 2d 1330 (Miss.1984)); *see also* ***Capital One Servs., Inc. v. Page***, 942 So. 2d 760, 763 (Miss. 2006) ("The polestar consideration for this Court is legislative intent.").

¶83.    Section 51-15-118 reads:

> The withdrawing county shall be responsible for paying its portion of any district bonds, contractual obligations, and any other indebtedness and liabilities of the district that are outstanding on the date of such county's withdrawal from the district. The withdrawing county's portion of such liabilities, obligations and indebtedness shall be determined through an independent audit conducted by a certified public accountant. The board of supervisors of the withdrawing county shall provide the sum that is required by this section either by appropriation from any available funds of the county or by levy. Such board of supervisors may borrow funds as needed to satisfy the withdrawing county's portion of the liabilities, obligations and indebtedness of the district as required herein.

Miss. Code Ann. § 51-15-118 (Rev. 2003). The statute as enacted provides that a withdrawing county must pay its contractual obligations "that are outstanding on the date of such county's withdrawal."[34] *Id.*   Notably, the statute further allows the county to borrow from the state "to satisfy the withdrawing county's portion of the liabilities, obligations and indebtedness of the district." *Id.*

¶84.    Beyond Section 51-15-118, the Legislative schema on the District states that it was created and codified in 1962. Miss. Code Ann. § 51-15-101 (Rev. 2003). The Legislature also stated the purpose of the District:

> It is further determined and declared that the preservation, conservation, storage, and regulation of the waters of the Pat Harrison Waterway District overflow waters for domestic, municipal, commercial, industrial, agricultural,

---

[34]The majority concludes, and I agree, that Lamar County's withdrawal date is September 6, 2011; however, withdrawal on September 6, 2011, is not complete until it pays $337,088. (Maj. Op.¶ 74).

and manufacturing purposes, for recreational uses, for flood control, timber development, irrigation, and pollution abatement are, as a matter of public policy, for the general welfare of the entire people of the state.

The creation of the Pat Harrison Waterway District is determined to be necessary and essential to the accomplishment of the aforesaid purposes, and this article operates on a subject in which the state at large is interested. *All the terms and provisions of this article are to be liberally construed to effectuate the purposes herein set forth*, this being a remedial law.

Miss. Code Ann. § 51-15-101 (emphasis added). Reading Section 51-15-118 in conjunction with Section 51-15-101 makes it clear that Section 51-15-118 should be liberally construed to preserve the District, which the Legislature labeled as "necessary and essential" to accomplish matters of public policy in furtherance of the general welfare. Miss. Code Ann. § 51-15-101, *see also* **Tunica County v. Hampton Co. Nat'l Sur., LLC**, 27 So. 3d 1128, 1133 (Miss. 2009) ("It is a general rule that in construing statutes this Court will not only interpret the words used, but will consider the purpose and policy which the legislature had in view of enacting the law. The court will then give effect to the intent of the legislature."). Rendering an opinion that outstanding refers only to contractual obligations that are "presently due and owing" does not construe the statute to preserve the necessary and essential district. Under the majority's holding, Lamar County will not pay for contractual obligations that stem from eight contracts entered into by the District prior to September 6, 2011, but Lamar County will continue to reap some benefit from the contracts. To bolster my interpretation of the statute, I would point out that the contractual obligations at issue do not cease with Lamar County's withdrawal. Rather, their yoke survives only to be shouldered by the remaining members of the district. Should today's result lead to a mass

exodus, woe to the last county standing that would alone bear the contractual obligations the majority holds do not exist.

¶85.   The majority's rather nonchalant response to my concerns appears in two parts. First, the majority points out that some of the contractual obligations at issue can be changed by the district or are ill-defined. In other words, while they exist at the time of the county's withdrawal, they cannot be said to be outstanding because they might change. Second, the majority writes that if all counties withdraw, any remaining contractual obligations (that the majority holds today do not exist) simply fall back into the lap of the State of Mississippi. In other words, despite the clear legislative directive that we should interpret the act creating the Waterway liberally with the goal of effectuating its purposes and clear legislative language establishing that, as a matter of public policy, the Pat Harrison Waterway District is necessary and essential, when pressed, the majority writes that the demise of the district is, in so many words, no big deal.

¶86.   The majority has thoroughly summarized the eight contracts at issue under Section 51-15-118. (Maj. Op ¶¶ 4-12) However, examining the contracts does not provide much aid in determining whether the contracts constitute outstanding contractual obligations. It is undisputed that the District has perpetual contractual duties under seven of the eight contracts. The dispute lies in whether or not the contractual duties must be presently due, specific, and owing to be considered outstanding.

¶87.   Turning to case law, to garner a definition of outstanding, the United States Supreme Court has stated that outstanding contracts may need to be valued, if they have no specific monetary amount. *Polk v. Mut. Reserve Fund Life Ass'n of New York*, 207 U.S. 310, 324

36

(1907) ("A very large part of the liabilities of any insurance company is upon outstanding contracts of insurance, not due and therefore not capable of exact measurement. Such liabilities can only be estimated or 'valued.'"). While *Polk* deals with the issue of insurance and not federal contracts, the Supreme Court's determination in *Polk* makes it clear that something need not be due nor capable of exact measurement to be considered outstanding.[35] Thus, *Polk* is at odds with the majority's bold assertion that obligations which are "future costs [that] have not been incurred and . . . [are] highly speculative" are not outstanding contractual obligations.

¶88.    The District was created to ensure the general welfare of the entire state by controlling and preserving the surface waters of the state. The Legislature made certain we are to interpret the statutes to preserve the district. *See* Miss. Code. Ann. § 51-15-101. Given the liberal interpretation afforded us by the Legislature and the Supreme Court's statement in *Polk* that outstanding is not required to mean capable of exact measurement nor due, I wholly disagree with the majority.

¶89.    As a final note, the majority states that defining the "contractual obligations . . . that are outstanding" is "an accounting decision as required by the statute." (Maj. Op. ¶ 58). It concedes that differing opinions were submitted to the fact-finder – on the meaning of the statute. However, it then wraps the meaning of the statute neatly into the blanket of the

---

[35]It is worth noting that holding outstanding to include contractual obligations *not* presently due nor capable of exact measurement does not foreclose a court from holding outstanding to refer to contractual obligations due or capable of exact measurement. *See Messiner v. Paulson*, 212 Cal. App. 3d 785, 788 (1989) (stating that an outstanding contractual obligation is the unpaid rent obligation); *Broadway Nat'l Bank of Bayonne v. Parking Auth. of City of Bayonne*, 191 A. 2d 169, 171 (N.J. 1963) ("[T]he Parking Authority had outstanding contractual obligations in the amount of $75,000.").

expert opinions by concluding that the fact-finder's role was to weigh the "credibility and evidentiary value" of the expert opinions. I respectfully disagree. The majority seemingly disregards the well established rule that statutory interpretation is a matter of law. ***Noone v. Noone***, 127 So. 3d 193, 195 (Miss. 2013). Thus, the role of the auditor is to determine the value of the contractual obligations that *the court deems* are outstanding contractual obligations.

¶90. The question of whether and to what extent the Court humbles itself and chooses to abide by its role in the constitutional, three-branch framework of our state's constitution when it considers matters of public policy – which, in the instant case, the Legislature has clearly decided for us – implicates the most fundamental and important principle of our chosen form of government. "Frequently an issue of this sort will come before the Court clad, so to speak, in sheep's clothing: the potential of the asserted principle to effect important change in the equilibrium of power is not immediately evident, and must be discerned by a careful and perceptive analysis." ***Morrison v. Olson***, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). When venturing into the arena of public policy, I believe the Court must check its ego at the door and pay all deference to the Legislature's pronouncements of it, and today I fear we fail to do so. Because the stakes include nothing less than the continued viability of an entity whose *raisons d'etre* the Legislature deems to be necessary and essential to the people of Mississippi – not to mention millions of dollars, I echo Justice Scalia and note that, in the instant case, the wolf in question "comes as a wolf." ***Morrison***, 487 U.S. at 699.

¶91. Accordingly, I respectfully dissent.

**KITCHENS, CHANDLER AND PIERCE, JJ., JOIN THIS OPINION.**